[Crim. No. 3540. Fourth Dist., Div. One. Sept. 15, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. GUS BEN
COLGAIN, JR., Defendant and Appellant.

Norbert Ehrenfreund, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and David N. Rakov, Deputy Attorney General, for Plaintiff and Respondent.

AULT, J. pro tem.*—After jury trial, appellant Gus Ben Colgain, Jr., was convicted of two counts of robbery in the first degree (Pen. Code, § 211) and one count of assault with a deadly weapon (Pen. Code, § 245). The trial court denied his application for probation, sentenced him to prison for the term prescribed by law on all counts, ordered the two robbery sentences to run concurrently and stayed execution of the sentence for assault with a deadly weapon pending appeal, the stay to become permanent when the concurrent sentences for robbery were completed. He appeals from the judgment of conviction.

THE ROBBERY OF DECEMBER 30, 1967 (COUNT I)

On December 30, 1967, shortly after 10 p.m., William Youngblood was stocking a walk-in cooler in back of the Manor Liquor store in La Mesa, California. He heard the automatic bell announcing the entry of a customer and went to the front of the store. He was met by a man pointing a small pistol at him who said: "Give me your money, all of it; make it snappy. I'm in a hurry." Youngblood gave him all the currency in the cash register, an amount he estimated to be approximately $350. The robber then ran out of the store, looking back at Youngblood as he did so. He was in the store only about three minutes, most of which time he was behind Youngblood.

The police were called and arrived within three or four minutes. Youngblood described the robber to them as dark complected, about 5′ 9″ tall, weighing 150-160 pounds, with short dark hair, wearing dark slacks, a black shirt, black trench

---

*Assigned by the Chairman of the Judicial Council.

coat, black gloves and sun-glasses with "a wrap-around effect" and with side pieces. His mouth was obscured by a mouth piece similar to wax candies children put in their mouths.

James Stephens was parked directly in front of the Manor Liquor store shortly after 10 p.m. on the night of the robbery. Before he could alight from his car, he saw a man, dressed entirely in black, run from the front door of the liquor store. The man was wearing dark glasses and had something on his chin. He was holding something in front of him in each hand. By the time he passed Stephens' car he no longer had the glasses on. The man ran very fast in front of Stephens' car in the direction of the Safeway Store parking lot where Stephens had earlier seen a cream or light-colored Pontiac parked. Stephens saw the Pontiac leave the parking lot and turn north on Severin Drive. Approximately 10 minutes later Stephens again saw the same man at the scene of an automobile accident near his home. The man was handcuffed. Stephens identified defendant in court as the man he saw running from the liquor store and later at the scene of the accident. Stephens was not asked by the police to go to the scene of the accident nor had he ever told the police he had done so. He had earlier given his name to the police who investigated the robbery.

Gary Reed was walking his dog on Horton Street in La Mesa at approximately 10:15 p.m. on the night of the robbery. He noticed a light-colored car traveling north on Horton Street at high speed. He watched the car run a stop-sign, go out of control and strike two other cars before it came to rest. Reed identified defendant as the driver of the light-colored car.

Shortly after 10 p.m. Norman Ames, a police officer of the City of La Mesa, heard an all-units radio call describing the armed robber as being a white male, approximately 5' 7" to 5' 9" tall, weighing between 150 and 170 pounds, olive complexion, dark close-cut hair, wearing dark clothing, a dark sweat-shirt type shirt and black trousers. While proceeding to the liquor store he was directed by radio to the scene of the accident on Horton Street. Upon arriving his attention was directed to defendant by bystanders as the driver of the car. He immediately noted that defendant fitted the description of the robber and placed defendant under arrest. A pat-down search revealed defendant's pockets to be "bulging" with money. A search of the automobile, which was a 1955 light green Pontiac, revealed more money, a pair of black gloves

lying on the right front floorboard, a pair of dark glasses and a small .25 caliber automatic pistol. The amount of money recovered from defendant and the car was approximately $300, including numerous five dollar and one dollar bills.

After Youngblood had given his description of the robber, another police officer came to the store and told him there had been an accident a few blocks away and it might be the person who held him up. Youngblood was taken to the scene and saw defendant, handcuffed and standing by the police car. He identified defendant as the man who robbed him.

### ASSAULT AND ROBBERY OF DECEMBER 21, 1967
### (COUNTS II AND III)

On December 21, 1967, nine days before the robbery described above, at approximately 6:55 p.m., Raymond Falter was waiting on a customer in the Grove Liquor store in Lemon Grove at 7245 Broadway. When he had finished, he looked up and saw a man pointing a gun at him. Without saying a word, the man fired. The bullet struck Falter under the right arm. He fell to the floor with his face to the wall. The man told him to get up and open the cash register, but Falter stated he could not. The man said something about shooting again and Falter gave him instructions on how to open the register. Falter remained on the floor and had no opportunity to observe the individual or what he did. He remembered the gun to have been a small one. He could not say if the robber actually took money, but he saw some money lying on the floor later when he turned over. Falter could not identify defendant as the robber, and he could say only that the robber was white, wore dark glasses and had a small gun.

Leonard George and his wife were standing at the cash register when the robber shot Falter. He then turned the gun on George and his wife who stepped back as the man went to the cash register. The man took money out of the register and ran out the back door, dropping money on the floor as he ran. George described the robber as approximately 5' 7" tall, with dark hair, wearing dark clothes and dark wrap-around glasses. He identified the gun as an automatic and similar to the one found in defendant's car. He did not think the glasses found in defendant's car were the ones used by the robber on December 21. He could not identify defendant as the robber.

Defendant, through his attorney, entered into a written stipulation which was read to the jury and received in evidence as People's Exhibit No. 25. It was stipulated if James A. Kaufman, a physician and surgeon, were called as a wit-

ness, he would testify he performed chest surgery on Raymond J. Falter on December 23, 1967, and removed the object [a bullet] identified as People's Exhibit No. 24 from his body.

It was further stipulated if Fred Wynbrandt were called as a witness he would testify he was a criminalist for the California Bureau of Criminal Identification, and that in his opinion the bullet removed from Falter's body (People's Exhibit No. 24) and the cartridge casing found on the floor of the Grove Liquor store (People's Exhibit No. 21) were fired from a .25 caliber automatic pistol (People's Exhibit No. 3), found in defendant's car. It was further stipulated that Wynbrandt was a duly qualified expert in firearm comparison and identification.

Carol Trump testified she met defendant in the Blind Alley, a bar in El Cajon, at approximately 10 o'clock on the evening of December 23d, and that he gave her a silver cross as a gift. That same evening, in the same bar, June Simmons saw defendant who gave her a gold cross and some baseball pennants for her son. Defendant told her he had made $500. He said he was selling encyclopedias for Colliers. Carol Trump saw defendant again on the 29th of December at the same bar. He also told her he was selling encyclopedias for Colliers, and had tentatively sold three or four sets which would bring him between $300 and $400.

William Durkee. the district manager of Colliers in San Diego. testified defendant came to work for Colliers a few days before Christmas. He made no sales and drew no commission, wages or money from the company.

### DEFENSE TESTIMONY

Defendant denied participating in either robbery. On the day of the Grove Liquor store robbery he stated he bought a used car, leaving the car lot around 6:30 p.m. He then went to White Front where he bought some shirts and met Mike Muller around 7 p.m. He testified he was wearing a white turtle-neck shirt and a red jacket that evening and never changed to other clothes. Mike Muller corroborated defendant's testimony as to the 7 p.m. meeting at White Front. He was impeached by testimony he had previously told El Cajon police officers the meeting was around 7:30 p.m. The used car dealer had also stated to police defendant bought the car between 5:30 and 6 p.m.

Defendant testified he acquired the gun on December 27th when he wrested it away from a man who attempted to hold him up. On the day of the Manor Liquor store robbery de-

fendant collected a $150 bet from a man named Willie or Charlie. He put the money with that already in his money clip, making a total of some $350. The gun was in his car because he intended to take it home and give it to his brother who was scheduled to go to Vietnam and who wanted it as a self-protection weapon in the event of his capture. He stated at the time of the accident both doors to the car flew open, his money clip hit something and money flew in all directions. He was picking up the money and shoving it into his overcoat pockets when apprehended.

## DISCUSSION

Appellant first contends the trial court erred in admitting identification testimony by the witness (Youngblood) to the robbery of December 30, 1967, because (1) defendant was denied the right to counsel at the pretrial identification procedure, and (2) the pretrial identification procedure was so unfair as to deny defendant due process of law.

In making this dual contention, appellant relies primarily on the trilogy of cases decided by the United States Supreme Court on June 12, 1967, *United States* v. *Wade,* 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926]; *Gilbert* v. *California,* 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951] and *Stovall* v. *Denno,* 388 U.S. 293 [18 L.Ed.2d 1199, 87 S.Ct. 1967].

In *Wade* the defendant was indicted and arrested for bank robbery. Fifteen days after counsel had been appointed to represent him, government agents arranged to have two bank employees observe a lineup made up of the defendant and five or six other prisoners. His attorney was not notified of the lineup and did not attend. At the lineup the two employees identified the defendant as the bank robber. At the trial the same employees pointed out the defendant as the person who had robbed the bank. On cross-examination the facts and circumstances of the lineup were brought out and the defendant moved to strike the court room identification testimony on the ground the pretrial lineup procedure, conducted in the absence of his counsel, violated his Fifth Amendment privilege against self-incrimination and his Sixth Amendment right to the assistance of counsel. His motion was denied.

The Supreme Court rejected the self-incrimination contention, but held the pretrial lineup identification procedure, in the absence of his counsel, violated the defendant's Sixth Amendment right to the assistance of counsel at a critical stage of the criminal proceeding. It reversed and ordered the trial court to hold a hearing to determine whether the in-court

identification had an origin independent of the lineup, or whether in any event the improperly received evidence was harmless.

In *Gilbert* as in *Wade,* the pretrial lineup identification of the defendant took place long after indictment and after counsel had been appointed to represent him. Counsel for the defendant was not notified of the lineup and did not attend. The court ruled as it had in *Wade,* holding: "The admission of the in-court identifications without first determining that they were not tainted by the illegal lineup but were of independent origin was constitutional error." (*Gilbert* v. *California,* 388 U.S. 263, 272 [18 L.Ed.2d 1178, 1186, 87 S.Ct. 1951].)

Admission of testimony by the witnesses at the trial they had identified the defendant at the illegal lineup, developed on direct examination, was held not curable by a showing that that identification had an independent source. The court ruled the defendant was entitled to a new trial unless the California Supreme Court was able to declare the erroneous introduction of the pretrial identification was harmless beyond a reasonable doubt. (*Ibid.* 274 [18 L.Ed.2d at p. 1187].)

In *Stovall* v. *Denno, supra,* 388 U.S. 293 the Supreme Court held the *Wade-Gilbert* rule of right to counsel at pretrial identification procedures would not be applied retroactively. It ruled pretrial identifications, in the absence of counsel, occurring before June 12, 1967, the date of the decision, would be permitted to stand unless they were so unnecessarily suggestive and conducive to irreparable mistaken identification as to deny due process of law.

We think there are cogent reasons the *Wade-Gilbert* right to counsel rule should not be extended to apply to the pretrial identification in the present case. Here the witness, Youngblood, identified appellant as the man who had robbed him only minutes after the holdup occurred, five or six blocks from the liquor store, at a place where appellant became involved in an automobile accident as he fled from the scene of the crime. There are present in this timely, in-the-field identification, public policy considerations wholly absent from the circumstances presented in *Wade* and *Gilbert* where the staged lineup identification procedures took place days after indictment, days after arrest and days after counsel had been appointed to represent the defendant.

Through good police work, good fortune, or a combination of the two, a criminal suspect may be apprehended so close

in proximity to the time and place of the crime itself, the exigencies of the situation and over-riding public policy make it neither practical nor necessary to afford counsel for an in-the-field identification. It is not necessary to our decision to define the actual limits of time or distance which circumscribe the procedure. It is sufficient that we be satisfied, as we are, the in-the-field identification in the instant case falls well within those limits.

Timely in-the-field identification is a procedure which enhances the reliability of the identification (*People* v. *Irvin*, 264 Cal.App.2d 747, 759-760 [70 Cal.Rptr. 892]; *Wise* v. *United States*, 383 F.2d 206, 209-210) and "aids in quickly exonerating the innocent and discovering the guilty" (*People* v. *Romero*, 263 Cal.App.2d 590, 593 [69 Cal.Rptr. 748]; see also *People* v. *Irvin*, *supra*, 759). The public benefit which flows from such procedures should not be underestimated. Where, as here, a serious crime has been committed, it is important to the public well-being that law enforcement officers know with speed and certainty the culprit has been apprehended. Once that fact has been ascertained, they may cease their efforts to catch the criminal—usually greatest and requiring most manpower immediately following the crime—and devote themselves to their other public duties. The general public in the area, although not directly involved, may have its apprehension put at rest by knowledge the perpetrator of the crime has been arrested and identified. Nor should we lose sight of the public interest in avoiding at this very early stage inconvenience and injustice to an innocent person if the use of the procedure results, as it frequently may, in the witness to the crime stating: "This is not the man." And, if an innocent man has been apprehended, should the police "await the assembling of a lineup, and the summoning of counsel, while the real perpetrators put more time, and presumably distance, between [himself] and the focal point of the offense?" (*People* v. *Irvin*, *supra*, 264 Cal.App.2d 747, 760.)

While we have stressed the public benefit to be derived from early in-the-field identifications, we are not unmindful of the serious prejudice a defendant may suffer by reason of any improperly carried out pretrial identification procedure. (See *People* v. *Fowler*, *(Cal.App.) 76 Cal.Rptr. 1.) But the impracticability of furnishing counsel for in-the-field identi-

---

*A hearing was granted by the Supreme Court on May 8, 1969. The opinion of that court is reported in 1 Cal.3d 335 [82 Cal.Rptr. 362, 461 P.2d 643].

fications, close in time and place to the commission of the offense, is apparent on the surface. To require the presence of counsel under the circumstances would so hinder, delay and obstruct the procedure as to make it unworkable. To apply the *Wade-Gilbert* rule to identifications comparable to that made in the instant case would, as a practical matter, require the police to discontinue the procedure or run the substantial risk of invalidating later in-court identifications.

We believe the public benefit derived from prompt in-the-field identification need not be sacrificed to the *Wade-Gilbert* rule of right to counsel. Neither *Wade* nor *Gilbert* requires such a holding. Such identifications should be per-mitted in the absence of counsel without legal impairment to the witness' later in-court identification, and testimony con-cerning such identifications should be admissible, except upon a showing in a given case the procedure was conducted so unfairly or in such an impermissively suggestive manner as to amount to a denial of due process of law.

Assuming *arguendo* the *Wade-Gilbert* right to counsel rule were applicable to Youngblood's pretrial identification testimony, the record before us is such we conclude any error in admitting it to have been harmless beyond a reasonable doubt. (*Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824] ; *United States* v. *Wade, supra,* 388 U.S. 218, 242 [18 L.Ed.2d 1149, 1166, 87 S.Ct. 1926] ; *Gilbert* v. *Cali-fornia, supra,* 388 U.S. 263, 264 [18 L.Ed.2d 1178, 1181, 87 S.Ct. 1951].)

The witness Stephens whose car was parked directly in front of the door to the liquor store, saw appellant run from the store to a light-colored Pontiac which he had previously seen parked on the Safeway lot. He watched appellant drive the Pontiac from the lot at a high rate of speed. Stephens gave his name and address to the police who investigated the robbery, and then drove home. Upon arrival, he noted a number of police cars passing his home and a commotion down the block. He went to the intersection and observed appellant and the same light-colored Pontiac. Stephens did not identify himself to the police at the accident scene. He did not testify at the preliminary hearing. Neither the police nor the prose-cutor was aware Stephens had seen appellant on the second occasion on the night in question until the day he appeared in court in answer to a subpoena to testify at the trial. His observation of appellant at the accident scene was pure happenstance. It was in no way a police-arranged confronta-

tion, and we know of no rule of law which would preclude him from testifying as to his observations.

Stephens' testimony at the trial was clear and unequivocal. He testified the man he saw running from the liquor store was the man he saw under arrest at the accident scene; the Pontiac automobile he saw smashed at the intersection was the car he first saw parked on the Safeway lot and the one appellant drove away from the robbery scene. In view of this testimony, if error occurred in admitting evidence of Youngblood's pretrial identification of appellant, we are satisfied such error was harmless beyond a reasonable doubt.

■ Appellant's contention the pretrial identification was so unfair as to amount to a denial of due process of law is likewise without merit. Because he was the only person exhibited for identification at the accident scene, because he was handcuffed and because most of the other people at the scene were dressed in night clothes, appellant asserts the confrontation was unfair. The fact he was the only person to be identified does not in itself vitiate the fairness of the identification. (*People* v. *Singletary,* 268 Cal.App.2d 41, 44 [73 Cal.Rptr. 855].) That is but one factor in the totality of circumstances by which the propriety of a pretrial confrontation must be judged. (*Stovall* v. *Denno, supra,* 388 U.S. 293, 302 [18 L.Ed. 2d 1199, 1206, 87 S.Ct. 1967].)

It was appellant, not the police, who set the stage for this identification. The police did not select the persons who were attracted from their homes by the collision and following confusion, nor did they dictate the attire to be worn by those who viewed the proceedings. The police officer who arrested appellant did so because he matched the description of the robber he had just received by radio. When the gun and loose currency were discovered, it would have been foolhardy indeed not to have placed appellant in handcuffs. A claimed violation of due process in a pretrial identification must be judged by "the totality of the circumstances surrounding it" (*Stovall* v. *Denno, supra,* 388 U.S. 293, 302 [18 L.Ed.2d 1199, 1206, 87 S.Ct. 1967]), and the total circumstances surrounding the identification in this instance are conducive to fairness and accuracy. In a similar situation where the same contention was made, the court in *Wise* v. *United States, supra,* 383 F.2d 206, 209-210 appropriately said: "Here was a confrontation proximate to the scene and time of the offense as well as the apprehension, where the observers and actors were limited to those that were in fact present at the scene and time of the

offense and the chase. Here were circumstances of fresh identification, elements that if anything promote fairness, by assuring reliability, and are not inherently a denial of fairness. . . . [W]e do not consider a prompt identification of a suspect close to the time and place of an offense to diverge from the rudiments of fair play that govern the due balance of pertinent interests that suspects be treated fairly while the state pursues its responsibility of apprehending criminals."

In *People* v. *Almengor,* 268 Cal.App.2d 614, 617-618 [74 Cal.Rptr. 213] this court held substantial prejudice, unfairness or impropriety must be shown to cause exclusion of evidence of pretrial identification and found no violation of due process under the circumstances of that case. Because of the extremely short period of time elapsing between the crime and the identification and the short distance between the place of identification and the scene of the crime, the instant case is even more persuasive of the propriety of the procedure used. Appellant's right to due process was not violated by the pretrial identification procedure used nor by the fact evidence concerning it was not excluded at his trial.

██ Appellant next contends the People failed to show by clear and convincing evidence the identification made in court was based solely on observations made at the robbery. That requirement comes into existence only if the pretrial identification is tainted by illegality (*People* v. *Caruso,* 68 Cal.2d 183, 189 [65 Cal.Rptr. 336, 436 P.2d 336]), and we have held to the contrary. Furthermore, when pressed on cross-examination, Youngblood insisted his identification of appellant was based on his observations at the robbery. His description of the robber first given to the police was so accurate appellant was immediately arrested at the accident scene. Appellant's similar dress, his possession of the similar gun, his possession of the currency, some loosely stuffed in his pockets and some fallen on the seat and floor of the car, the preponderance of five dollar and one dollar bills, the wrap-around sun glasses used in the robbery and found in the car, the positive identification of the car as the one used in the robbery and involved in the accident, convince us beyond a reasonable doubt no mistake in identification was made. (See *People* v. *Singletary, supra,* 268 Cal.App.2d 41, 44.)

██ Appellant finally contends the evidence is insufficient to support the conviction under counts II and III of the information which charged the assault and robbery of December 21, 1967. He argues first there was no proof any money

was actually taken from the store. Such proof is not necessary to establish the robbery. A witness testified he saw the robber take money from the cash register, but drop it on the floor as he fled from the store. After the robbery, money was found on the floor of the store. "The crime of robbery is complete when the robber unlawfully and by means of force or fear gains possession of the movable property of another in the presence of its lawful custodian and reduces it to his manual possession. His escape with the loot is not necessary to complete the crime." (*People* v. *Clark,* 70 Cal.App.2d 132, 133 [160 P.2d 553].) See also *People* v. *Hartman,* 256 Cal.App.2d 547, 550 [64 Cal.Rptr. 235]; *People* v. *Johnson,* 219 Cal. App.2d 631, 633 [33 Cal.Rptr. 359].

 Although no witnesses positively identified appellant as the gunman at the Grove Liquor store robbery and shooting, the general description given closely matched that given by the witnesses to the second holdup. Furthermore, the circumstantial evidence that appellant was that gunman is highly persuasive. The ballistic evidence establishes the gun found in appellant's possession after the December 30th robbery was the one used to inflict the wound sustained by Raymond Falter in the December 21st robbery. Appellant's explanation he had acquired the gun on December 27 when he had wrested it from a man who attempted to hold him up does not warrant belief. The strong evidence establishing appellant as the perpetrator of the December 30th robbery, the evidence establishing the gun used by appellant in the second robbery was the same gun used in the first robbery and appellant's flimsy and unbelievable explanation of how the gun came into his possession, considered in combination, point unerringly to appellant as the man who shot and robbed Raymond Falter on December 21, 1967. Appellant's convictions under counts II and III of the information are supported by substantial evidence convincing us of his guilt beyond reasonable doubt.

In its judgment of conviction the trial court found "the defendant was armed with a deadly weapon within the meaning of Section 3024 of the Penal Code as to Counts I and II and was not so armed as to Count III." The finding appellant was armed with a deadly weapon has significance as it affects his right to probation under Penal Code section 1203 if he should be convicted of another crime in the future. The increased minimum penalty provisions of Penal Code section 3024 and the additional penalty provisions of Penal Code section 12022 are not applicable to the present convictions of

robbery and assault with a deadly weapon. (*People* v. *Floyd*, 71 Cal.2d 879 [80 Cal.Rptr. 22, 457 P.2d 862].)

In accordance with *People* v. *Floyd*, *supra*, the finding quoted above is stricken from the judgment and the judgment is modified by substituting the following in its place: "the defendant was armed with a deadly weapon, a .25 caliber automatic pistol, at the time he committed the crimes alleged in count I, II, and III, within the meaning of Penal Code section 1203, but sections 3024 and 12022 of the Penal Code are not applicable to the convictions."

As modified, the judgment is affirmed.

Brown (Gerald), P. J., and Coughlin, J., concurred.