[Crim. No. 5255. Fourth Dist., Div. One. May 16, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
EDWARD ARTHUR GRACE, Defendant and Appellant.

**COUNSEL**

Kenyon C. Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Mark L. Christiansen and Alan S. Meth, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

AULT, J.—Defendant Edward Arthur Grace appeals from an order granting probation entered after he pleaded nolo contendere to possession of dangerous drugs (Health & Saf. Code, § 11910, now § 11350) following denial of his motion to suppress evidence under Penal Code section 1538.5. He contends the motion to suppress evidence should have been granted because (1) the police stopped his car without legal justification, (2) his subsequent detention, interrogation, and pat-down search were

illegal, and (3) his consent to a later search which revealed the contraband was not voluntary, and, in any event, was vitiated by the officer's prior illegal activity. The appeal is authorized by Penal Code section 1538.5, subdivision (m).

The motion to suppress evidence was heard and determined on the transcript of the preliminary hearing. The only testimony bearing on the motion was given by the arresting officer, Eric Neal Dixon, of the San Diego Police Department. It reveals a patent boot-strap procedure based upon a succession of impermissible police intrusions which invalidate the search and require a reversal of the conviction.

Dixon testified he saw Grace drive his car from a parking lot in San Diego onto Moraga Boulevard about 7:45 p.m. on March 27, 1972. It was dark. Observing the car from a distance of 75 yards and at a 30° angle, he noticed its right rear brakelight *appeared* to be inoperative. Although he followed the car for several blocks, watched it make a left turn onto Kamloop Street and a right turn onto Taos Street, and brought it to a stop directly in front of him, Dixon said he never looked again to see if the right brakelight was functioning.

When Dixon turned on the police car's red light, Grace properly brought his car to an immediate stop. Dixon alighted from the police car, found the right rear brakelight *was* operative,[1] yet conducted an examination and test of the car which included having Grace "check out" the headlights. This examination revealed the car had no high-beam headlights and no high-beam indicator. Dixon decided to issue Grace a warning for defective headlight equipment (Veh. Code, §§ 24406 and 24408).[2]

While his police partner wrote out the warning, Dixon decided to run a record check on Grace and to "engage him in conversation."

Having received nothing but complete cooperation from Grace, and having observed no suspicious act on his part, Dixon asked point blank if he had ever been arrested. Grace said he had been arrested for armed robbery and that he was then on probation. When Dixon inquired about the

---

[1]Dixon testified he found the right rear brakelight was operative but "dimmer" than the one on the left. He did not state the light failed to comply with code requirements. He determined not to issue a citation or warning with respect to the brakelight or to require Grace to repair it. (See Veh. Code, § 40150.)

[2]Single beam headlights are permitted on cars manufactured and sold prior to September 19, 1940 (Veh. Code, § 24410), and a high-beam indicator is not required on such a vehicle (Veh. Code, § 24408). We note nothing in the record to indicate the kind of car Grace was driving or when it was first registered in the State of California.

conditions of probation, Grace said he was not permitted to carry firearms or to consume alcoholic beverages. Dixon asked if the conditions of his probation made him subject to search, and Grace replied this was not included as a condition of his probation.

Dixon ordered Grace to exit his vehicle and proceeded to pat him down for weapons. He found no weapons. He conducted the pat-down search because Grace "was not allowed to carry offensive weapons" as a condition of his probation. He pointed to no facts which gave any indication that Grace was carrying offensive weapons and did not testify he himself had any such belief or suspicion.

Immediately after the pat-down search, Dixon asked, "May I search your person?" Grace replied: "I thought you did." Dixon said: "No, I didn't. I just patted you down." "Now I would like to search you." Grace said: "Go ahead."

Dixon searched Grace and removed from his jacket two foil-wrapped packages which he had felt during the pat-down search. The packages contained what he thought were, and what proved to be, LSD tablets. Dixon arrested Grace for possession of dangerous drugs.

### DISCUSSION

Dixon's statement that he never looked again, after his initial observation, to see if the brakelight on the car he followed and stopped was operative, coupled with his admission that later inspection demonstrated the light was functioning, lends little credence to his claim he initially stopped the car because of an inoperative brakelight.

Assuming, however, that Dixon was merely unobservant and that the initial stop was legally justified, his right to detain the driver ceased as soon as he discovered the brakelight was operative and not in violation of statute. From that point on, Dixon had no right to detain Grace further, to require him to "check-out" the headlights, or to inspect the car to find equipment violations to justify further detention, a record check and interrogation.

Police officers are not empowered to stop cars, detain drivers and conduct tests to discover vehicle equipment violations without cause. Vehicle Code section 2806 confers such right on general police officers *only* when they have *reasonable cause to believe* the vehicle is not equipped as required by the Vehicle Code or is in an unsafe condition. The section

reads: "Any regularly employed and salaried police officer or deputy sheriff having reasonable cause to believe that any vehicle or combination of vehicles is not equipped as required by this code or is in such unsafe condition as to endanger any person, may require the driver to stop and submit the vehicle or combination of vehicles to an inspection and such tests as may be appropriate to determine the safety to persons and compliance with the code." (Veh. Code, § 2806.)

■ When Dixon learned his initial reason for stopping Grace had no basis in fact, his business with him was concluded. He did not have reasonable cause to believe the car was not equipped in accordance with the Vehicle Code and he had no right to conduct an exploratory examination to uncover a violation. Since the interrogation, pat-down, and search which revealed the contraband all occurred while Grace was illegally detained, the evidence obtained should have been suppressed. (*People* v. *Moore,* 69 Cal.2d 674, 683 [72 Cal.Rptr. 800, 446 P.2d 800]; *Willett* v. *Superior Court,* 2 Cal.App.3d 555, 559 [83 Cal.Rptr. 22]; *People* v. *Lingo,* 3 Cal.App.3d 661, 664-665 [83 Cal.Rptr. 755].)

Moreover, the investigatory detention imposed here exceeded constitutional limitations in other respects. ■ As this court pointed out in *Willett* v. *Superior Court, supra,* 2 Cal.App.3d 555, at page 559: "[J]ust as a search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope (*Terry* v. *Ohio,* 392 U.S. 1, 18 [20 L.Ed.2d 889, 903, 88 S.Ct. 1868, 1878]), so may an investigatory detention exceed constitutional bounds when extended beyond what is reasonably necessary under the circumstances which made its initiation permissible." (See also *People* v. *Bremmer,* 30 Cal.App.3d 1058, 1061 [106 Cal.Rptr. 797].)

■ An investigation relating to the detention required to issue a warning or citation for a minor traffic or vehicle equipment violation is limited in scope. The officer may require the driver to identify himself, produce his driver's license and the registration certificate for the vehicle, and he may interrogate with respect to the violation or violations which he has observed. Absent some suspicious circumstance, he may not search the driver or the vehicle (*People* v. *Superior Court* [*Simon*], 7 Cal.3d 186, 201-202 [101 Cal.Rptr. 837, 496 P.2d 1205]; *People* v. *Superior Court* [*Keifer*], 3 Cal.3d 807, 815 [91 Cal.Rptr. 729, 478 P.2d 449, 45 A.L.R.3d 559]), and he may not conduct an exploratory interrogation designed to elicit incriminating information wholly unrelated to the matter at

hand. (*People* v. *Lingo, supra,* 3 Cal.App.3d 661, 664; see also *People* v. *Bremmer, supra,* 30 Cal.App.3d 1058, 1062.)[3]

Dixon's statement he decided to "engage" Grace in conversation is pure subterfuge. This is demonstrated by his lead-off question asking Grace if he had ever been arrested. The interrogation was a fishing expedition extending beyond what was reasonably required to issue a routine vehicle equipment warning. ■ "An officer may not, routinely and without any cause whatsoever, detain every citizen he encounters—even if he has violated some traffic rule—in order to interrogate him . . . about any other possible offense, and then use the reply to such questioning as an excuse for a search otherwise unlawful." (*People* v. *Lingo, supra,* 3 Cal.App.3d 661, 664.) If Dixon had any reasonable basis for initiating this line of questioning, the People chose not to disclose it either at the preliminary hearing or when they had the opportunity to present evidence at the hearing on the motion to suppress. The record before us presents no evidence whatever to justify it. Information gained from this unconstitutional interrogation cannot be used to sanction any of the events which followed.

Even if we were to overlook the preceding constitutionally impermissible intrusions, we find nothing in the record to support the legality of the pat-down or the finding Grace voluntarily consented to the search which revealed the contraband. Grace was not subject to search as a condition of his probation (see *People* v. *Mason,* 5 Cal.3d 759, 765 [97 Cal.Rptr. 302, 488 P.2d 630]), and Dixon had no basis to believe that he was. Dixon conducted the pat-down because Grace told him (upon interrogation) that his probation order prohibited him from carrying offensive weapons.

■ Contrary to Dixon's apparent belief, an order which prohibits a pro-

---

[3]Despite its apparent approval in such cases as *People* v. *Elliott,* 186 Cal.App.2d 185, 189 [8 Cal.Rptr. 716], *People* v. *Brown,* 272 Cal.App.2d 448, 450 [77 Cal.Rptr. 438] and *People* v. *Bremmer,* 30 Cal.App.2d 1058, 1062 [106 Cal.Rptr. 797], we also entertain a strong doubt as to the propriety of what has seemingly become a standard police practice of running a "record check" on all drivers stopped for minor traffic violations. Without more, the fact that a motorist has committed a minor traffic violation does not provide reasonable cause to believe there is a warrant out for his arrest or that he is a wanted criminal. Unless officers can point to specific factors making them reasonable in the circumstances, we believe such inquiries are unwarranted and that the detentions occasioned by them are illegal. It is no answer to assert the procedure involves no added inconvenience to the citizen because it is carried out while the officer makes an investigation of the offense and writes out the citation. The inevitable result is that the length of the detention will be governed, not by the time reasonably required by the officer to perform his proper duty, but instead by how long it takes him to receive an "all clear" from the source or sources to which he made inquiry. The record is wholly devoid of any circumstance to warrant the procedure here.

bationer from carrying weapons does not subject him to a pat-down search for weapons by a police officer at any time. ". . . a probationer is not without rights under the Fourth Amendment, even one whose rights have been radically restricted by court-imposed conditions of probation." (*People* v. *Bremmer, supra,* 30 Cal.App.3d 1058, 1063.) Had Dixon rightfully come by the information that Grace's probation order prohibited him from carrying offensive weapons, a pat-down search for weapons was not justified unless he could point to specific facts or circumstances giving him reasonable grounds to believe Grace might be carrying such weapons on his person. (See *People* v. *Superior Court [Simon], supra,* 7 Cal.3d 186, 206.) The fact Grace had been stopped for a vehicle equipment violation did not provide reasonable grounds for Dixon to believe Grace was carrying weapons. Dixon did not testify he entertained any such suspicion.

Under the cases we have cited, the second search of Grace's person was vitiated by the prior illegal police conduct. Moreover, the trial court's implied finding that Grace voluntarily consented to the second search is not supported by substantial evidence. Where, as here, a police officer has ordered an accused from his vehicle and subjected him to a search based upon authority and not consent, the officer's burden to establish that the accused voluntarily consented to the second search which immediately followed is a heavy one. Under these circumstances, there are cogent reasons to declare the consent involuntary as a matter of law (*People* v. *Superior Court [Casebeer],* 71 Cal.2d 265, 270-271 [78 Cal.Rptr. 210, 455 P.2d 146]). In any event, Dixon's brief statement of what transpired is not sufficient to meet the burden.

Beginning with the highly questionable stop of Grace's car and culminating in the search of Grace's person which revealed the dangerous drugs, the total record in this case demonstrates a thinly veiled predisposition to search Grace under any circumstance. It also reveals, not one, but a series of unconstitutional transgressions which make the final search illegal and require a reversal of the judgment.

The judgment is reversed.

Brown (Gerald), P. J., and Whelan, J., concurred.