[Crim. No. 11307. Fourth Dist., Div. One. July 11, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
GEORGE E. ODOM, Defendant and Appellant.

COUNSEL

Sheela, Lightner & Castro, Barton C. Sheela, Jr., Christopher J. Schatz and John R. Petty for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Richard D. Garske and A. Wells Petersen, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**STANIFORTH, J.**—A jury convicted George E. Odom of murder in the second degree with the finding he used a firearm in the commission

of the crime. The jury denied his plea of not guilty by reason of insanity, concluded he was sane. Odom was committed to prison for a term of eight years. On appeal, Odom's contentions are fivefold: (1) A warrantless search of his truck and seizure of materials violated his constitutional rights. (2) He further contends the later search of the truck with a warrant was constitutionally impermissible since the warrant was issued on the basis of information gained through the original warrantless search. (3) The curbstone "showup" violated his rights to due process as being impermissively suggestive and denied him effective assistance of counsel. (4) The trial court erred in failing to grant his Penal Code section 1118.1 motion to withdraw the first degree murder charge from the jury. (5) Finally it is argued that the presentation of the defense of diminished capacity precluded instruction by the court on implied malice.

## FACTS

Elze Hunt's Fiat was stopped for a red light in the middle lane on one-way Fourth Avenue at Elm Street, San Diego, when defendant Odom drove up, stopped at an angle adjacent to the driver's side of Hunt's car. Odom said "Hey look." Hunt and passenger Coleman turned, saw Odom pointing a pistol at Hunt's head. Odom fired two shots, killing Hunt. Coleman in panic got out of the car. Odom in pickup quickly departed, turned left on Elm Street, drove the wrong way on a one-way street and turned left (northbound) on Fifth Avenue. Witness Ms. Svensson had observed Odom's pickup truck being driven erratically just before the stop and the fatal shooting. The police were immediately called to the death scene where these witnesses gave the police a detailed description of both the killer and his pickup truck. The police within minutes broadcast these accounts on the police radio.

Police Officers Hewitt and Carr were responding to the radio report of the shooting when they saw a vehicle matching the radio description—the green American-made pickup truck with white camper shell—a few blocks distance from the shooting. They effected a "hot stop." Fourteen minutes elapsed between the first report to the police and Odom's apprehension. Odom got out, shouted obscenities to the officers, appeared upset. He was subdued, handcuffed, given a pat-down search and placed in the rear of the police car. Odom refused to consent to search of the pickup. Officer Carr however opened the doors, looked at the seats and front floorboard but saw no weapon. Carr returned and read Odom his *Miranda* warning. Officer Snead, now on the scene,

asked Odom for consent to search the truck but consent was again refused. In the meantime, yet another officer (Williams), unaware of the refusals, searched the cab area. He pulled the cab seat forward, saw, retrieved a .22 revolver and a bottle of brandy. The .22 caliber handgun was the murder weapon.

Witnesses Svensson and Coleman were taken by police to where Odom had been stopped. Each was told not to talk to one another and to keep an open mind because this might or might not be the person involved. The officer did not refer to Odom as a suspect; an officer at the scene cautioned them just because the man was in custody did not necessarily mean he was involved in the shooting. There were approximately seven officers, several police cars at the arrest scene. Svensson identified the pickup as the one that had cut her off, drove erratically on Fourth Avenue. Odom was removed from the back of the police vehicle in handcuffs and placed alone on the curb for Coleman to view. Coleman identified Odom as the man who fired the shots and the pickup truck as the murder vehicle. These identifications took place approximately 45 minutes after the shooting. The pickup was impounded and an exhaustive search made later pursuant to a search warrant.

DISCUSSION

I

■ Odom's Penal Code section 1538.5 motion to suppress the murder weapon found in the pickup truck was denied. He asserts this to be error. A search conducted without a warrant issued upon probable cause is "*per se* unreasonable." (*Katz v. United States* (1967) 389 U.S. 347, 357 [19 L.Ed.2d 576, 585, 88 S.Ct. 507, 514]; *People v. Minjares* (1979) 24 Cal.3d 410, 416 [153 Cal.Rptr. 224, 591 P.2d 514].) Here the first search of the truck was conducted without a warrant, therefore the burden rested upon the prosecution to establish justification under recognized exception to the warrant requirement. (*People v. James* (1977) 19 Cal.3d 99, 106 [137 Cal.Rptr. 447, 561 P.2d 1135].) Odom argues there was no justification to search the truck and the facts "[reveal] a patent boot-strap procedure based upon a succession of impermissible police intrusions which invalidate the search and require a reversal of the conviction." (*People v. Grace* (1973) 32 Cal.App.3d 447, 450 [108 Cal.Rptr. 66].) ■ It has been long recognized (since

*Carroll* v. *United States* (1925) 267 U.S. 132 [69 L.Ed. 543, 45 S.Ct. 280, 39 A.L.R. 790]) that the mobility of an automobile makes it particularly susceptible to searches under the "exigent circumstances" exception to the warrant requirement. In short, "'as "long as it can be demonstrated that (1) exigent circumstances rendered the obtaining of a warrant an impossible or impractical alternative, and (2) probable cause existed for the search",'" a warrantless search of an automobile can be conducted. (*Wimberly* v. *Superior Court* (1976) 16 Cal.3d 557, 563 [128 Cal.Rptr. 641, 547 P.2d 417].) However, both of these requirements must be satisfied. "[N]o amount of probable cause can justify a warrantless search or seizure absent 'exigent circumstances.'" (*Coolidge* v. *New Hampshire* (1971) 403 U.S. 443, 468 [29 L.Ed.2d 564, 584, 91 S.Ct. 2022, 2039]; *People* v. *Dumas* (1973) 9 Cal.3d 871, 884 [109 Cal.Rptr. 304, 512 P.2d 1208].) The elements peculiar to an automobile which may give rise to exigent circumstances are that the car is movable, the occupants are alerted and the car's contents may never be found again if the warrant must be obtained. (*Chambers* v. *Maroney* (1970) 399 U.S. 42, 51 [26 L.Ed.2d 419, 428, 90 S.Ct. 1975, 1981].) But absent such circumstances, the Fourth Amendment requires a warrant. There is no general automobile exception to the warrant requirement. (*South Dakota* v. *Opperman* (1976) 428 U.S. 364, 378, 383 [49 L.Ed.2d 1000, 1013-1014, 96 S.Ct. 3092, 3103].)

The precise question here is whether there were exigent circumstances sufficient to excuse compliance with the warrant requirement. There is no question but Officer Williams was searching, prying into hidden places for that which was concealed, that which was put out of the way. (*People* v. *Irvin* (1968) 264 Cal.App.2d 747, 754 [70 Cal. Rptr. 892].) That the officers had probable cause to search the pickup for the murder weapon may also be conceded.

The officers here knew that the driver of a suspect vehicle had within the past 15 minutes fired a loaded gun from within the cab of the pickup truck. The pat-down had failed to reveal the gun. Therefore it was patently reasonable for the officers under these circumstances to believe a search of the cab of the pickup would reveal a loaded gun. (*People* v. *Laursen* (1972) 8 Cal.3d 192, 201 [104 Cal.Rptr. 425, 501 P.2d 1145].)

The validity of the search by Officer Williams turns upon the meaning of the term "exigent circumstances." The fact Odom was in police

custody did not remove the exigent circumstances of a loaded gun in the cab of the pickup. A loaded gun on the floor behind the driver's seat is not in the same category as personal luggage. (Cf. *People* v. *Minjares, supra,* 24 Cal.3d 410, 418.) In *Arkansas* v. *Sanders* (1979) 442 U.S. 753, 760-761 [61 L.Ed.2d 235, 242-243, 99 S.Ct. 2586], it was said: "One of the circumstances in which the Constitution does not require a search warrant is when the police stop an automobile on the street or highway because they have probable cause to believe it contains contraband or evidence of a crime. [Citations], 'the guaranty of freedom from unreasonable searches and seizures by the Fourth Amendment has been construed, practically since the beginning of the Government, as recognizing a necessary difference between a search of a store, dwelling house or other structure in respect of which a proper official warrant readily may be obtained, and a search of a ship, motor boat, wagon or automobile, for contraband goods, where it is not practicable to secure a warrant . . . .' [Fn. omitted.] There are essentially two reasons for the distinction between automobiles and other private property. First, as the Court repeatedly has recognized, the inherent mobility of automobiles often makes it impracticable to obtain a warrant. [Citations.] In addition, the configuration, use, and regulation of automobiles often may dilute the reasonable expectation of privacy that exists with respect to differently situated property. [Citations.]" And it was held in *Chambers* v. *Maroney, supra,* 399 U.S. 42, 51-52 [26 L.Ed.2d 419, 428]: "In enforcing the Fourth Amendment's prohibition against unreasonable searches and seizures, the Court has insisted upon probable cause as a minimum requirement for a reasonable search permitted by the Constitution. As a general rule, it has also required the judgment of a magistrate on the probable-cause issue and the issuance of a warrant before a search is made. Only in exigent circumstances will the judgment of the police as to probable cause serve as a sufficient authorization for a search. *Carroll, supra,* holds a search warrant unnecessary where there is probable cause to search an automobile stopped on the highway; the car is movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained. Hence an immediate search is constitutionally permissible.

"Arguably, because of the preference for a magistrate's judgment, only the immobilization of the car should be permitted until a search warrant is obtained; arguably, only the 'lesser' intrusion is permissible until the magistrate authorizes the 'greater.' But which is the 'greater' and which the 'lesser' intrusion is itself a debatable question and the an-

swer may depend on a variety of circumstances. For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment."

*People v. Laursen, supra,* 8 Cal.3d 192, 201 [104 Cal.Rptr. 425, 501 P.2d 1145], is factually in point. The Supreme Court stated: "*Chambers* [*Chambers v. Maroney,* 399 U.S. 42] and *McKinnon* [*People v. McKinnon* (1972) 7 Cal.3d 899 (103 Cal.Rptr. 897, 500 P.2d 1097)] establish the rule that when there is probable cause to believe that an automobile stopped on a highway contains contraband, evidence of a crime, or was itself an instrumentality of the commission of one, law enforcement officers need not obtain a warrant before conducting a search since there is no distinction of constitutional proportion between an immediate search on probable cause without a warrant and the automobile's immobilization until one is secured." (Fn. omitted.)

The choices presented here as alternate to immediate search of the cab were impounding or police surveillance of pickup until a warrant could be obtained. The almost redhanded apprehension of a prime murder suspect, the strong reasonable belief that the instrumentality of the crime, the murder weapon, was in the cab, the dangers of loss of evidence inherent in any lengthy stakeout of the cab or moving and impounding of the truck, each supports the conclusion that it was not practicable in these circumstances to secure the warrant. In view of the time and space relationship to the shooting scene, there was also an urgent, immediate need to ascertain whether there was *no* weapon in the car in order to institute an immediate retracing of Odom's flight route to search for any discarded weapon.

## II

The more thorough search based upon a search warrant after the truck was impounded was authorized by the same factual circumstances that warranted the police in promptly looking for the weapon at the arrest site. That same ample probable cause supports the issuance of the search warrant to examine the cab in greater detail for evidence of the crime.

## III

■ Odom next asserts the curbstone one-on-one identification by Coleman was impermissibly, unconstitutionally suggestive. Heinous wrongs have been associated with incorrect identification based upon improper procedures. *United States* v. *Wade*, 388 U.S. 218, 229 [18 L.Ed.2d 1149, 1159, 87 S.Ct. 1926, 1933], for example, singles out for condemnation the one person lineups for identification since "[i]t is obvious that risks of suggestion attend...and [they] increase the dangers inhering in eyewitness identification. [Fn. omitted.]"

Nevertheless the propriety of the prompt in-the-field identification by an eyewitness has been upheld repeatedly by both state and federal decisions. (See *People* v. *Rodriguez* (1970) 10 Cal.App.3d 18, 29-30 [88 Cal.Rptr. 789]; *People* v. *Anthony* (1970) 7 Cal.App.3d 751, 764-765 [86 Cal.Rptr. 767]; *People* v. *Levine* (1969) 276 Cal.App.2d 206, 208 [80 Cal.Rptr. 731]; *People* v. *Colgain* (1969) 276 Cal.App.2d 118, 125-127 [80 Cal.Rptr. 659]; *People* v. *Craig* (1978) 86 Cal.App.3d 905, 913 [150 Cal.Rptr. 676].)

The potential unfairness in such suggestiveness, however, is offset by the likelihood that a prompt identification within a short time after the commission of the crime will be more accurate than a belated identification days or weeks later. Because the problem is inherent in such confrontations, the choice is between prohibiting all in-the-field identifications or permitting them notwithstanding the element of suggestiveness. The choice involves a balancing of the interests of fairness to criminally accused persons and prompt, proper and efficient law enforcement, and the choice has properly been made to permit in-the-field identifications, because the immediate knowledge whether or not the correct person has been apprehended is of overriding importance and service to law enforcement, the public and the criminal suspect himself. (*Stovall* v. *Denno* (1967) 388 U.S. 293, 302 [18 L.Ed.2d 1199, 1206, 87 S.Ct. 1967, 1972]; *People* v. *Floyd* (1970) 1 Cal.3d 694, 714 [83 Cal. Rptr. 608, 464 P.2d 64]; *People* v. *Colgain, supra,* 276 Cal.App.2d 118, 128-129; *People* v. *Irvin, supra,* 264 Cal.App.2d 747, 759-760.)

The trial court had before it the evidence concerning the admonitions given the witnesses by the two police officers and the nature and extent of observations by Coleman of Odom and the totality of circumstances of the curbside identification (*People* v. *Anthony, supra,* 7 Cal.App.3d 751) and determined the procedure was legally proper; it did not give

rise to any misidentification. Ample evidence supports that conclusion. Where a defendant claims the pretrial identification was unnecessarily suggestive, he must show it gave rise to a very substantial likelihood of irreparable misidentification. (*Simmons* v. *United States* (1968) 390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253, 88 S.Ct. 967].) Odom has not carried his burden on this score.

Finally, there was no requirement for the appointment of counsel before the curbside showup. (*Kirby* v. *Illinois* (1972) 406 U.S. 682, 688 [32 L.Ed.2d 411, 417, 92 S.Ct. 1877, 1881].) The right to counsel attaches at postindictment formal lineups. (*People* v. *Duck Wong* (1976) 18 Cal.3d 178, 186 [133 Cal.Rptr. 511, 555 P.2d 297].)

IV

Defendant next contends that the trial court erred in failing to withdraw the first degree murder charge from consideration by the jury. At the close of the prosecution's case and after the defense rested, Odom moved for acquittal under Penal Code section 1118.1 as to the charge of first degree murder. The court denied the motion.

Odom asserts the People, as a matter of law, had not proved a case of first degree murder beyond a reasonable doubt and therefore it was the duty of the judge to take the case from the jury. The defendant argues the trial court by focusing in its reasoning for denial on possible interference with the jury process, instead of the sufficiency of the prosecution's evidence, failed to apply the proper standard to a section 1118.1 motion for acquittal.

The test is "whether from the evidence, including reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged...." (*People* v. *Valerio* (1970) 13 Cal.App.3d 912, 919 [92 Cal.Rptr. 82].) *People* v. *Anderson* (1968) 70 Cal.2d 15, 25 [73 Cal.Rptr. 550, 447 P.2d 942], holds the People have the burden of establishing beyond a reasonable doubt that the killing was the result of premeditation and deliberation and that therefore the killing was first rather than second degree murder. Odom, in the days immediately preceding the killing, discussed slaying several people without verbalizing any real necessity that the victim be someone he knew or that he personally had a motive to kill. Odom placed the gun in his pickup. It is a reasonable inference that Odom cut off Svensson to get into position where he could kill from

close proximity. The manner of the killing reinforces the planning, the premeditation aspect of the crime and would sustain a finding of first degree murder. The fact that such evidence did not convince the jury beyond a reasonable doubt of the first degree murder does not establish retroactively an insufficiency of evidence to authorize the first degree murder charge to go to the jury. Finally, Odom was not convicted of first degree murder. If error be assumed, no prejudice is shown.

V

■ Odom next contends the trial court improperly instructed the jury as to the elements requisite for conviction of murder in the second degree; he charges prejudice resulted from the instruction as to implied malice (as part of the charge relating to second degree murder) in view of his defense of diminished capacity.

Penal Code section 188 defines malice: "Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow-creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." *People* v. *Conley* (1966) 64 Cal.2d 310, 322 [49 Cal.Rptr. 815, 411 P.2d 911], enlarged upon the statutory definition of implied malice, saying: "An intentional act that is highly dangerous to human life, done in disregard of the actor's awareness that society requires him to conform his conduct to the law, is done with malice regardless of the fact that the actor acts without ill will toward his victim or believes that his conduct is justified. In this respect it is immaterial that he does not know that his specific conduct is unlawful, for all persons are presumed to know the law including that which prohibits causing injury or death to another. An awareness of the obligation to act within the general body of laws regulating society, however, is included in the statutory definition of implied malice in terms of an abandoned and malignant heart and in the definition of express malice as the deliberate intention unlawfully to take life." In *People* v. *Poddar* (1974) 10 Cal.3d 750, 757 [111 Cal.Rptr. 910, 518 P.2d 342], the Supreme Court held that malice may be implied from a finding that the defendant acted with "wanton disregard for human life." The court noted: "If it is established that an accused, because he suffered a diminished capacity, was unaware of or unable to act in accordance with the law, malice could not properly be

found and the maximum offense for which he could be convicted would be voluntary manslaughter." (*Id.*, at p. 758.) Odom contends the instruction given here was improper under *People v. Poddar, supra.*

Odom argues he did not act from a base antisocial purpose or by reason of abandoned and malignant heart and inaptly cites the example of a person who recklessly discharges a firearm into a crowd of people with total disregard of the consequences, as were the facts in *People v. Stein* (1913) 23 Cal.App. 108, 113 [137 P. 271]. We echo that 1913 decision where it was said: "We can conceive of no stronger evidence of 'an abandoned and malignant heart. . . .'" (*Id.*, at p. 118.)

The issue in *People v. Poddar, supra,* 10 Cal.3d 750, like our inquiry here, was directed to the propriety of finding implied malice in the light of an assertion and evidence of diminished capacity. The court in *Poddar* noted (p. 758): "The effect,. . .which a diminished capacity bears on malice in a second degree murder-implied malice case is relevant to two questions: First, was the accused because of a diminished capacity unaware of a duty to act within the law? A person is, of course, presumed to know the law which prohibits injuring another. Second, even assuming that the accused was aware of this duty to act within the law, was he, because of a diminished capacity, unable to act in accordance with that duty? [Citations; fn. omitted.] If it is established that an accused, because he suffered a diminished capacity, was unaware of or unable to act in accordance with the law, malice could not properly be found and the maximum offense for which he could be convicted would be voluntary manslaughter." Thus malice as the *Poddar* court noted is to be properly implied when the killing resulted from an accident involving a high degree of probability of death *and* is accompanied by the requisite mental element. (*Id.*, at p. 759.) *Poddar* fashioned that three-pronged inquiry as the proper procedure requisite to a finding of malice aforethought. "First, was the act or acts done for a base, antisocial purpose? Second, was the accused aware of the duty imposed upon him not to commit acts which involve the risk of grave injury or death? Third, if so, did he act despite that awareness? The first determination is expressly required in accordance with the definition of implied malice, and the second and third determinations are required relative to the question of 'wanton disregard' also in accordance with the definition of implied malice." (*Id.*, at pp. 759-760.) Here CALJIC No. 8.31 given by the court reflects correctly the statutory standard of implied malice.

(*Id.*, at p. 757.) Further, CALJIC No. 8.77 was given by the trial court.[1] This instruction is completely responsive to the directive of *People* v. *Poddar* (p. 760). The shocking character of the wrong committed by Odom is sufficient to warrant a finding of implied malice as a matter of fact. The fact that certain psychiatric testimony on behalf of Odom is contrary to evidence presented on behalf of the People is not sufficient to preclude the application of the implied malice doctrine. There were psychiatric tests both in support of and opposed to Odom's diminished capacity defense. The jury chose to believe the People's expert testimony.

Odom argues that implied malice and diminished capacity are essentially inconsistent theories which serve only to confuse a jury. This is not true. Each doctrine is separate, distinct in the law, and the jury was properly instructed as to correct principles applicable to each. There is no factual or theoretical inconsistency in the jury's finding of implied malice and its finding against diminished capacity. If the jury had found in favor of Odom's contention of diminished capacity, such a factual determination would have precluded their finding of specific intent or implied malice. The instructions given would compel such a result.

---

[1] "If you find from the evidence that at the time the alleged crime was committed, the defendant had substantially reduced mental capacity, whether caused by mental illness, mental defect, intoxication, or any other cause, you must consider what effect, if any, this diminished capacity had on the defendant's ability to form any of the specific mental states that are essential elements of murder and voluntary manslaughter. [¶] Thus, if you find that the defendant's mental capacity was diminished to the extent that you have a reasonable doubt whether he did, maturely and meaningfully, premeditate, deliberate, and reflect upon the gravity of his contemplated act, or form an intent *to kill, you cannot find him* guilty of a willful, deliberate and premeditated murder of the first degree. [¶] Also, if you find that the defendant's mental capacity was diminished to the extent that you have a reasonable doubt whether he was able to form the mental state constituting *either express or implied malice* aforethought, you cannot find him guilty of murder of either the first or second degree. [¶] [If you have a reasonable doubt (1) whether he was able to form an intention unlawfully to kill a human being, or (2) whether he was aware of the duty imposed *on him not to commit acts which* involve the risk of grave injury or death, or (3) whether he did act despite that awareness, you cannot find that he harbored express malice.] [¶] [Further, if you have a reasonable doubt (1) whether his acts were done for a base, antisocial purpose, or (2) whether he was aware of the duty imposed on him not to commit acts which involve the risk of grave injury or death, or (3) whether he did act despite that awareness, you cannot find that he harbored implied malice.] [¶] [Furthermore, if you find that as a result of mental illness, mental defect, or intoxication, his mental capacity was diminished to the extent that he neither harbored malice aforethought nor had an intent to kill at the time the alleged crime was committed, you cannot find him guilty of either murder or voluntary manslaughter]."

## VI

■ Defendant next contends the trial court erroneously refused to admit certain evidence from expert witnesses. Odom's expert witnesses had read and relied upon several "adverse reaction" reports from medical suppliers and related those reports to their ultimate diagnosis and opinion of Odom's mental state at the time of the killing. The adverse reaction reports in question related to the psychotic effects of the drug Aldomet when used either alone or in combination with alcohol.

■ An expert witness, in support of, in giving the reasons for his opinion, may testify as to treatises, learned documents, textual material relied upon by him and may thereafter be *fully cross-examined* thereon by opposing counsel. (Evid. Code, §§ 701, 802.) However, as noted by the Supreme Court in the case of *People* v. *La Macchia* (1953) 41 Cal.2d 738, 745-746 [264 P.2d 15]: "The general rule which permits a witness to state the reasons upon which his opinion is premised may not be used as a vehicle to bring before the jury incompetent evidence. To so open up the inquiry would create a disastrous break in the dike which stands against a flood of interminable investigation."

■ The basic rule of *People* v. *La Macchia, supra,* 41 Cal.2d 738, prohibiting a witness from putting in evidence matters which are incompetent as substantive evidence for the purpose of fortifying his opinion, even though they are offered under the guise for the reasons for his opinions, and even though they might properly have been admitted on cross-examination to test *and* diminish the weight to be given to his opinion, was and is the law in this state. (*People* v. *Nahabedian* (1959) 171 Cal.App.2d 302, 310-311 [340 P.2d 1053]; *Buchanan* v. *Nye* (1954) 128 Cal.App.2d 582, 586 [275 P.2d 767]; *Furtado* v. *Montebello Unified Sch. Dist.* (1962) 206 Cal.App.2d 72, 79 [23 Cal.Rptr. 476]; *Intoximeters, Inc.* v. *Younger* (1975) 53 Cal.App.3d 262, 270 [125 Cal.Rptr. 864].)

In the early case of *Baily* v. *Kreutzmann* (1904) 141 Cal. 519, 521, 522 [75 P. 104], the Supreme Court declared: "It has been held, without conflict and in an extended line of cases in this state, that medical works are hearsay and inadmissible in evidence, except perhaps on cross-examination when a specific work may be referred to, it seems, to discredit a witness who has based his testimony upon it. [Citations.] . . . If the books themselves are hearsay and inadmissible, certainly any re-

cital of their contents or the substance thereof is none the less hearsay, and should be excluded for that reason." (See also *Brown* v. *Colm* (1974) 11 Cal.3d 639, 644, fn. 4 [114 Cal.Rptr. 128, 522 P.2d 688].)

The trial judge here properly excluded the adverse reports for these further reasons. The doctors testified they had considered the adverse reaction reports from the major drug manufacturers in forming their opinion; it was the psychiatrist's opinion and his expertise, not the validity of the adverse reaction reports, that were at issue. Therefore the court could properly limit the admission of detailed evidence from those adverse reports under its wide discretionary powers under Evidence Code section 352. (*Huber, Hunt & Nichols, Inc.* v. *Moore*, 67 Cal. App.3d 278, 294-297 [136 Cal.Rptr. 603].)

Judgment affirmed.

Brown (Gerald), P. J., concurred.

**WIENER, J.**—I concur in the judgment and reasoning of the court in all respects except as to its conclusion there were justifiable circumstances to permit a warrantless search of the truck. Admittedly, this is an area of considerable confusion. (See, e.g., *People* v. *Rodriguez* (Crim. 21522) petition for hearing granted by the California Supreme Court on June 19, 1980.) Based upon existing precedent, the admission of the weapon was error. However, any error is harmless beyond a reasonable doubt. The weapon was only cumulative to the testimony from the witnesses who personally observed the shooting and who identified both the vehicle and the defendant.

Appellant's petition for a hearing by the Supreme Court was denied September 4, 1980.