Filed 3/26/13  P. v. Phothisane CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JOHNNY PHOTHISANE,<br><br>        Defendant and Appellant. | A132073<br><br>(San Francisco City & County<br>Super. Ct. No. 209257) |

A married couple walking home after dinner was robbed at gunpoint of a large bag containing the wife's laptop.  The robber sped away in a silver Mustang.  The wife memorized part of the license plate.  They called the police, describing the robber and the car.  The next night, the police called them at 2:00 a.m. to ask if they could come to the police station immediately to attempt an identification of a suspect.  Both husband and wife identified defendant in a cold show, and defendant made admissions that led to the recovery of the laptop.  A jury convicted defendant of robbery.  On appeal, defendant argues the cold show procedure was unnecessary and unduly suggestive, and his statements were involuntary because they were induced by promises of leniency.  We conclude the cold show was neither unnecessary nor unduly suggestive under the circumstances of this case, and that defendant's statements were voluntary.  Therefore, we will affirm.

**STATEMENT OF THE CASE**

Defendant Johnny Phothisane was charged by amended information with one count of robbery, personal use of a firearm, and service of four prior prison terms.  (Pen.

Code, §§ 211, 12022.53, subd. (b), 667.5, subd. (b).)[1]  A jury convicted defendant of robbery and found the firearm use allegation true.  The prosecution dismissed the prior prison term allegations.  In a later negotiated disposition, the prosecution amended the information deleting the firearm use allegation under section 12022.53, subdivision (b), adding a personal firearm use allegation under section 12022.5, subdivision (a), and reinstating two of the prior prison term allegations.  Defendant admitted the gun allegation and the two prior prison terms.  The court sentenced defendant to state prison for 11 years.  Defendant timely appeals.

**STATEMENT OF THE FACTS**

*The Robbery*

Around 1:30 a.m. on October 18, 2008, Luis Costadone (Luis) and Amy Kight Costadone (Amy) were walking home on Bay Street in San Francisco after dinner when, at the intersection of Bay and Webster Streets, "somebody jumped out of the corner."  Luis was carrying his wife's large brown bag.  The robber pointed a gun at him and said, "Give me the bag."  The gun was a very dark opaque metal automatic, similar to the ones that police carry.  When Luis did not react, the robber cocked the gun, pointed it at his face and said, "This ain't no joke.  Give me the bag."  At this point, Luis was looking at the gun and at the robber, but his main focus went to the gun.  He did not notice the robber had a deformed left hand.

After Luis handed over the bag, the robber got into the passenger side of a silver Mustang with tinted windows that was parked about 15 to 20 feet away, and the car "took off."  The bag contained Amy's work laptop, phone, wallet with all her credit cards, keys, iPod, sunglasses, and work shoes.  The laptop, a Dell machine, was marked "Property of PG&E Corporation."

Luis had two glasses of beer that evening and was not drunk.  The lighting was fairly good; the robbery occurred under a street light.  He was able to clearly see the

---

[1] Unless otherwise indicated, all statutory references are to the Penal Code.

robber. Luis described the robber as an Asian male with a shaved head, about six feet tall, wearing a dark, puffy jacket and baggy jeans.

Amy's description of the robbery was consistent with her husband's. She was standing about three feet away from her husband when he was robbed, and the gun was never pointed at her. Amy also failed to notice a deformity on the robber's left hand. After the robber got into the car, Amy stood in the middle of the street memorizing the license plate number until the robber noticed her and shouted, "Hey, get out of here."

In a 911 call, Luis or his wife described the robber and the car and continued walking home. The police arrived at their apartment shortly after the couple did, 10 to 15 minutes after the robbery. Luis described the event, the robber and the gun.

Amy described the robber at trial as an "Asian man, about early twenties, about 6 feet tall, black hair . . . shaved—not quite fully shaved but very short hair," wearing a black, puffy jacket and baggy jeans. This description was consistent with what she told the 911 operator when she called on the night of the robbery. During that phone call, Amy conferred with her husband about the color of the jacket—whether it was red or dark—and the type of jeans. She also told the 911 operator the gun "looked like a toy gun." She admitted to the 911 operator, "I don't know what kind of gun it was."[2]

She and her husband together provided a description of the robber and his clothing when they met with the police outside their apartment.

*Defendant's Arrest and Initial Interview*

Almost exactly 24 hours after the robbery, at 1:00 a.m. on October 19, 2008, San Francisco Police Officer Joan Cronin stopped a silver Mustang after the driver, defendant, made an illegal turn from Turk Street onto Fillmore Street. The make, color and license plate matched the description of the car involved in the previous night's robbery. She detained defendant and his passenger, another Asian male named Lucky Silharath. A puffy jacket was located inside the vehicle. Defendant was arrested and transported to the Northern Police Station.

---

[2] After discussing the type of gun used by the robber with her husband, Amy wrote in her police statement that it was a Glock-type gun.

Defendant's interview by Sergeant William Braconi was recorded. After defendant was *Mirandized,*[3] he initially told Braconi he had not been in San Francisco the night before and he did not know anything about a robbery or any stolen property. Braconi described defendant's demeanor at this point as relaxed, almost light. Braconi then told defendant that some people had described his car, had gotten his license plate number, and "described him to a tee" and were coming to "have a look" at him. At this point, defendant's demeanor changed a bit and he said he was feeling faint, although he did not appear faint to Braconi. Braconi took defendant to the location where he was to be viewed by the Costadones.

*The Cold Show*

The police called the Costadones at approximately 2:00 a.m. to come to the police station "to identify a possible suspect." Luis's request to come at a more convenient hour was denied. After the Costadones arrived at the station, Officer Cronin explained the cold show procedure, using the San Francisco Police Department's cold show instruction form verbatim. Cronin admonished Luis and Amy separately. In essence, Cronin advised each of them that they were going to be taken by police department personnel to a location where they would be asked to look at a person to help determine if that person committed the crime; that the person they would see may or may not be the perpetrator of the crime being investigated; that they should not assume that the person they look at committed the crime; that the police had someone detained, that the detained person may or may not have been involved in the crime; and that they were under no obligation to identify anyone. In addition, Officer Cronin said: "Do not think because this person's detained by us that he committed the crime in question. If you don't identify anybody, that's okay. And don't discuss this with other victims or witnesses." Officer Cronin asked each of the witnesses to confirm that he or she had read and understood the admonition and then asked each of them to sign the form. Each of them acknowledged that he or she understood and then signed the form in Cronin's presence.

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436.

4

First, Luis was taken to the station parking lot in Officer Cronin's patrol vehicle to view defendant. He was able to make an identification. Officer Cronin then went through the same procedure with Amy. She was also able to make an identification.

During both cold shows defendant was handcuffed and illuminated in such a way that each of the witnesses could see him, but he could not see them. The witnesses viewed defendant from a distance of approximately 15 feet.

At trial, the Costadones' recollections of the cold show were consistent with Officer Cronin's.

Luis did not feel obligated to pick the suspect. He took a good look, just to be certain, and told the police officer: "It looks very much like him, yes." At trial, Luis said that he knew it was the same person who had robbed him because "he was dressed the same way, and what I remember the most was kind of like the look. I remember the previous night he was—I don't know how to explain it, but there was like a stare, because I was probably looking at his face the most since the gun was pointing at me all the time, and it was the same expression the previous day. [¶] It was definitely the same person." In addition, defendant tilted his head a little bit sideways during the robbery and at the cold show.

After viewing defendant, Luis was shown a silver Mustang. It was the same car, and it had the same license plate that his wife reported in the 911 call. Amy also viewed the suspect during the cold show from a police car. The suspect stood in the spotlight in front of the police car about 15 feet away. After studying him for about 10 to 15 seconds, she told the police officer, "That's him." She was very "confident" about her identification. She "did not want to wrongly identify somebody and put them through an experience that they [didn't] deserve."

*Defendant's Admissions*

After the cold show, as defendant and Braconi were walking back into the station, defendant volunteered he could get the computer back. Defendant asked Braconi something to the effect, "Would it help . . . me if I could get the computer back?" Braconi responded, "I would convey that assistance to the judge, the district attorney, and

5

whoever else might follow up on this case." When the interview resumed, they "started trying to figure out how that was going to take place." Eventually, defendant admitted the computer stolen in the robbery was in the possession of a person named Phet, which is short for Somphet. He said Phet's sister had purchased the laptop for $200. Defendant never mentioned the name Bhot. Defendant said his passenger, Lucky, knew where Phet lived.

*Recovery of the Laptop*

Lucky and several police officers went to Phet's house in Richmond, sometime after 3:00 a.m. There were several people watching television and drinking beer in the garage. One of the men was using a PG&E computer. Somphet told Braconi the computer was his, but he had loaned it to the other person to use at that particular moment. Phet signed a property receipt for a Dell laptop computer with a label on the back that said "Property of PG&E Corporation" when Braconi took the laptop.

*Identifications At Trial*

Luis and Amy identified defendant at trial as the person who robbed Luis at gun point on October 18, 2008. Amy identified the laptop in evidence as hers. Luis identified a black puffy jacket as familiar looking, in that he had seen it on the robber.

*The Defense Case*

At trial, Phet's sister, 44-year-old Chanthone, testified she had been wanting a laptop and one night after she came home from work as a custodian, at 2:00 a.m., she bought the Dell computer from a person whose name she did not know. Her other brother, Thavone, had knocked on her door and told her "this guy want to sell laptop." Thavone also told her the laptop belonged to the sister of this guy, and they wanted to sell it. She had never seen the seller before that night. Thavone said it was a good laptop, so Chanthone said, "Okay, then I'll buy it." She gave Thavone $200 for the computer, and Thavone gave the money to the unknown seller. The seller was an Asian man. When she saw him, he was sitting down inside the garage where Thavone stayed, but he looked tall, about five feet nine inches or five feet ten inches tall, and he was bald headed. She never actually had the laptop in her possession. She just gave the money to her brother, and the

seller said he was going to go get a password from his sister so he could unlock the computer.  Chanthone never saw the laptop again.  She had seen defendant before, but he was not the person who sold her the laptop.  At the time of trial, her brother Thavone was in prison.

Five days after the robbery, Chanthone bought a silver Mustang from defendant's mother, at his mother's request.  She paid defendant's mother about $1300 for it.  Defendant's mother wanted to get the car from impound, and she did not have the money.  Chanthone went to San Francisco with defendant's mother and purchased the car from impound.  Both Chanthone and defendant signed the documentation for the purchase of the car on October 23, 2008.  She had seen the car parked in front of her house when "Johnny" came to visit her brother, but not the night she bought the laptop, that she remembered.

Fifty-one-year-old Phet testified that his sister Chanthone gave the laptop to their brother Thavone.  Phet knew a man named Bhot, who was six feet tall and bald.  Thavone told Phet that he (Thavone) had made a deal with Bhot for the laptop, but Phet did not see the deal.  Phet had known defendant for about two months before the night the police came for the laptop, but he never heard that defendant was nicknamed "Phot."  Phet had known Bhot for "a couple [of] months" as of the night of the laptop incident, but Phet did not see him thereafter.  Phet signed a receipt giving the laptop to the police, but it was his friend Savone who actually had it that night.

Forensic science consultant James Norris testified as an expert in firearms and replicas.  Metal replica guns "are actually very complicated devices . . . [that] are designed to appear to operate in exactly the same way as a real semiautomatic pistol that would fire an explosive cartridge, like a real gun . . . ."  The muzzle of a replica gun is usually "day glow orange" in color, but can be darkened with a felt pen.  Quality replicas with darkened muzzles mimic real guns so well "you cannot tell the difference without actually taking the weapon into your possession and examining the internal mechanism."

Forensic psychologist Dr. Mitchell Eisen testified as an expert on eyewitness memory and suggestibility.  Human memory is not as perfect as a camera, and attentional

7

capacity limits ability to remember accurately.  Asked to recall information, we tend to fill in the gaps using inferences that make sense to us.  Sometimes those inferences are "spot on" and sometimes they are in error.  Misinformation studies have shown that suggestibility plays a role in how something is recalled.  If the information makes sense, is plausible, and comes from a good source, the information can be incorporated into the memory, even if the information is in error.

Alcohol consumption can dim memory.  Studies have shown that intoxicated persons are more likely to make false identifications than sober persons.  He opined that intoxicated people oftentimes will have more gaps in their memories and so are more open to suggestion from good sources about how to fill in those gaps.

Similarly, traumatic stress can narrow the attentional focus at the expense of the ability to process other information that would otherwise be easily noticed.  For this reason, the presence of a weapon may adversely affect memory.  It is very common for people to become focused on the weapon.  Trauma can also affect one's sense of time.

The passage of time can affect a person's memory.  "[M]emory reports given closer to the experience in time tend to be more detailed and otherwise more accurate than those given after lengthy delays."  In addition, as time passes, there are more opportunities to be influenced by post-event information that can influence memory.  "[T]hat's why memory reports given closer to the event are less likely to be affected by these other sources and tend to be fresher and more detailed."  When witnesses talk to each other about an event they all experienced, they tend to incorporate into their memories details they learned from others, but could not have seen themselves.

Dr. Eisen also opined that, in cold shows, witnesses are admonished that the person in the cold show is not necessarily the person involved in the crime.  The reason for this is "[i]t's well understood that many, if not most people, when they come to any identification test whatsoever . . . assume that the person being shown to them . . . must in fact, be the culprit.  And it's their job to figure out which one he is or to make the identification now or . . . lose their chance."  The admonition works against the

8

assumption that the police know something they don't. Studies show that the false-positive error rate for cold shows is higher than for lineups.

Defendant testified in his own behalf. He was 24 years old in October of 2008. He had two felony convictions, one for auto burglary in 2006 and one for joyriding. Bhot is a friend of his. On October 17, 2008, Bhot borrowed his car. Defendant was home watching television all that night until he went to sleep. Bhot brought the car back about 4:30 p.m. the next day. They smoked crystal meth in the bathroom of defendant's house. Bhot pulled out a wad of money and gave defendant $30. Defendant asked Bhot where he got all that money and Bhot said he sold a laptop to Somphet's sister. Defendant asked no more questions and Bhot left.

Later that night, defendant and his friend Lucky went to San Francisco. While driving his car, defendant was stopped by the police. He was taken to the Northern Police Station, handcuffed to a bench, and told by Sergeant Braconi that he was a suspect in a robbery that had occurred the previous night. Defendant told the officer, "I don't know what [you're] talking about." When Braconi asked him if the people who were coming to the station would be able to identify him, defendant said, "No." Braconi "kept insisting about people's property." Defendant was not able to give Braconi any information about the property. But after the cold show, he realized "this might have something to do" with the laptop Bhot told him about, and so defendant told Braconi, "I knew of a laptop." Braconi "asked me, 'Can you get these people's property back?' [I] said I could. 'I don't know if it's the laptop you're looking for.' That's what I told him."

Defendant said he might be able to get the property back if Braconi would allow him to use the phone. Braconi gave defendant access to the phone, and defendant called his mother and his mother's boyfriend several times, but neither answered. Defendant then suggested that Lucky, whom he assumed was still at the police station, could drive his car to Richmond to get the laptop from Somphet. Braconi said, "No." Defendant then told Braconi the laptop was at a house on 30th Street in Richmond, and that Lucky knew the house. After that, Braconi left. Defendant thought Braconi would return with

9

the laptop and let him go home. Instead, Braconi never came back and defendant went to jail.

Defendant did not mention Bhot to Braconi because he did not want to be a snitch. Defendant testified he did not rob Luis Costadone, was not even in San Francisco when the robbery happened, and was innocent.

## DISCUSSION

*Admissibility of Identification Evidence*

Prior to trial, an Evidence Code section 402 hearing was held on the admissibility of the Costadones' identifications after the cold show and their anticipated in-court identifications. Following the hearing, at which Officer Cronin and the Costadones testified, the court denied the defense motion to suppress the identifications and ruled the evidence admissible.

On appeal, defendant renews his constitutional objections and argues that the Costadones' identifications of defendant after a cold show were obtained in a manner and under circumstances that were so suggestive as to cast serious doubt on their accuracy. He asserts that his conviction should be reversed because his due process rights were violated by reliance on a "highly dubious and prejudicial procedure," and because the Costadones' subsequent identifications at trial were not independently reliable under the totality of the circumstances. For the reasons discussed below, we disagree the cold show procedure used in this case, or the admission of the Costadones' identifications of defendant at trial, violated defendant's constitutional rights.

*Factual Background*

At the hearing, Officer Cronin testified that following the traffic stop, defendant was detained for possession of auto burglary tools. He also had a parole hold. Defendant's passenger, Lucky, was also detained.

At 2:35 a.m., Officer Cronin read to Luis and his wife separately the police department's written cold-show admonition, a form which each acknowledged and signed. Cronin advised each participant he or she would be looking at a person to help determine if that person committed the crime; the person may or may not be the

10

perpetrator of the crime being investigated by the police; the witness should not assume that the person in the cold show committed the crime; the witness should not discuss the matter with any other victims; and no witness was under an obligation to identify anyone.

Luis identified defendant as the robber. He told Cronin: "It looks very much like him, yes." When Cronin asked him "if he was sure . . . he said he was sure or he said yes."

At 2:40 a.m., the cold show with Amy followed. She identified defendant as the robber. She told Cronin, "[T]hat's him." Asked by Cronin if she was sure, Amy responded, "I feel confident that's him."

At trial, the parties stipulated that the robbery involved a short period of time, a minute or less.

Luis confirmed that at the station a police officer went over every part of the cold-show admonition form with him and he signed it. He was at the station for about half an hour before the actual viewing. During the cold show, he was about 15 to 20 feet away from defendant. He knew right away that defendant was the robber because defendant had the same stare and expression on his face as the night before, and it was "very vivid" in his mind. There was no chance he identified defendant because the police had told him about the car and other facts related to the incident. He did not feel pressured by the police to make a decision, and if it wasn't the person he would have said, "I'm not sure or no."

Amy testified that her husband told her the police had called to say they had somebody who may have been involved in the robbery the previous night, and the two of them needed to go down to the station then. At the station, she was advised of some rules prior to the viewing. She signed a document, confirming that she understood the rules. She received the same admonitions her husband was given by Officer Cronin.

During the cold show she was in the back of a police car and her husband was not with her. The suspect was brought into the parking lot and stood about 15 feet away. He was illuminated by a spotlight and handcuffed. There was at least one police officer in close proximity to him.

11

Amy did not feel she was expected to identify the suspect and felt no pressure to do so. She was confident in her identification because the suspect had the same build as the robber and she remembered his face. She was also confident that she identified the suspect's vehicle after she identified him.

On the night of the robbery, there was adequate street lighting; she got a very good look at the robber's face.

*Principles Governing Pretrial Identification Procedures*

We apply the following principles to the question whether an identification following a cold show requires suppression. The defendant bore the burden below of showing an unreliable identification procedure. " 'The issue of constitutional reliability depends on (1) whether the identification procedure was unduly suggestive and unnecessary [citation]; and if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances . . . . If, and only if, the answer to the first question is yes and the answer to the second is no, is the identification constitutionally unreliable.' [Citation.] In other words, '[i]f we find that a challenged procedure is not impermissibly suggestive, our inquiry into the due process claim ends.' [Citation.]" (*People v. Ochoa* (1998) 19 Cal.4th 353, 412 (*Ochoa*); see also *People v. Kennedy* (2005) 36 Cal.4th 595, 608, overruled on another point in *People v. Williams* (2010) 49 Cal.4th 405, 459.)

*The Cold Show Here Was Not Unduly Suggestive Or Unnecessary*

Defendant argues that the cold show here was impermissibly suggestive because the information given to the witnesses, and the manner in which it was delivered, improperly suggested to them "that the perpetrator had been apprehended and that it was crucial that they corroborate that fact." Specifically, he asserts the procedures used here were unduly suggestive in that: (1) Luis was told on the phone that a "suspect" had been apprehended; (2) by calling the Costadones at 2:00 in the morning, "the police well may have led the witnesses to believe that they would not need to show up at such an inconvenient time, were the police not certain that the suspect was the man who had robbed Luis"; (3) that inference was strengthened by the officer's refusal to let the

12

Costadones come to the station later; (4) at the station prior to the cold show, the Costadones were told the suspect had been found in a car that matched the description of the robber's car; (5) the cold show was conducted at the police station "where appellant was clearly in police custody"; (6) spotlights were shining on him; (7) at least one officer was escorting and guarding him; (8) defendant was handcuffed; and (9) following the viewing, the police escorted defendant back into the station. He concludes: "Viewed in totality, the situation undoubtedly indicated to the witnesses that, to the police, [defendant] was clearly the perpetrator."

"Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." (*Neil v. Biggers* (1972) 409 U.S. 188, 198.) However, we begin our analysis with the understanding that a single-person showup *is* inherently suggestive (*People v. Odom* (1980) 108 Cal.App.3d 100, 110), but is not for that reason inherently unfair. " 'A procedure is unfair which suggests in advance of identification by the witness the identity of the person suspected by the police.' [Citation.]" (*Ochoa, supra,* 19 Cal.4th at p. 413.) Whether an identification procedure is unduly suggestive and unfair depends upon the procedure used, as well as the circumstances in which the identification takes place.

Here, many of the details of the cold show that defendant argues were unduly suggestive are inherent in *any* showup, especially one that occurs at night. These include the illumination with spotlights, the handcuffs, and the presence of a police officer nearby. It is also inherent in any showup for the police to indicate they have a suspect in custody. Why else would the police ask the victims or witnesses of a crime to view the person? Moreover, conducting the showup at a police station rather than on a street corner does not seem *unduly* suggestive— in either case, it is clear to the witness that a suspect is in custody. And, Officer Cronin testified that she would typically conduct a cold show at the station in the situation where, for example, a suspect had been arrested and transported to the station because the complaining witness was not immediately available.

13

Citing *People v. Sandoval* (1977) 70 Cal.App.3d 73 (*Sandoval*), defendant argues the cold show here was not only unduly suggestive, but also unnecessary because there were no "compelling reasons" to conduct a single person showup, as opposed to waiting until a time when a photo or corporeal lineup could be arranged. However, compelling reasons often reside in the judgment of the officer. Prompt identification of a suspect close to the time and place of the offense serves a legitimate purpose in quickly ruling out innocent suspects and apprehending the guilty. (*People v. Martinez* (1989) 207 Cal.App.3d 1204, 1219.) Such identifications are likely to be more accurate than a belated formal lineup identification. (*Ibid.*) Here, the cold show was arranged as soon as a suspect in the robbery was detained, which happened to be 25 hours after the crime occurred. It was very important to confirm or dispel suspicion of defendant's involvement sooner rather than later. The victims' memories were relatively fresh, and the chance that they would muddy their individual recollections by repeatedly going over the traumatic event with each other increased with the passage of time. In addition, if the victims were able to identify defendant as the robber, there was a very real possibility that police would be able to recover some of the property if they acted quickly enough. In this case, conducting a cold show as soon as possible made sense and was a necessary component of the police investigation.

*Sandoval, supra*, 70 Cal.App.3d 73, is distinguishable. In that case, "[t]he victim was told by the police before she saw the defendant that they would bring the suspect through that hallway because they were bringing others through another way. She affirmed that when she saw him she 'understood' that he was the man the police 'thought' had 'snatched' her purse. Thus . . . 'the procedure followed in effect suggested' to the victim that defendant was the robber." (*Id.* at p. 85.) Importantly, in *Sandoval* the police *failed* to admonish the victim prior to the showup in the police station.

The trial court did credit Amy's testimony she was advised before the cold show the police also had a vehicle in custody, and Luis's testimony the police used the term "suspect" prior to the cold show. The court saw both circumstances as suggestive. However, viewed in the totality of the circumstances, those comments did not make the

14

cold show unduly suggestive or unfair, given the efforts made by the police to admonish the witnesses and neutralize the inherent suggestiveness of the procedure. We conclude the cold show identification procedure used here was not constitutionally infirm. (Cf. *People v. Gomez* (1976) 63 Cal.App.3d 328, 335–337, [one person showup was permissible notwithstanding that victim was told there was a suspect the police wanted her to look at, that the defendant was standing outside a patrol car, handcuffed, with two officers, and that victim volunteered her identification before being admonished].)

In light of our conclusion the cold show was not impermissibly suggestive, we could end our inquiry here. (*Ochoa, supra,* 19 Cal.4th at p. 412.) However, even assuming arguendo the cold show procedure was unnecessary and unduly suggestive, we do not find that the identifications were unreliable under a totality of the circumstances. "[T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." (*Neil v. Biggers, supra*, 409 U.S. at pp. 199–200.) Defendant argues the identifications were unreliable because there was a lapse of 25 hours between the cold show and the robbery, the robbery itself lasted only a short time, the robber did not wear distinctive clothing, neither witness noticed a glaring deformity in his left hand, i.e., missing fingers, and Luis was focused on the gun.

We disagree with defendant's reflections on the *Neil v. Biggers* factors. In our view, the cold show was conducted while the previous night's event was still fresh in the Costadones' minds; each of them had sufficient time and ample lighting to get a good look at the robber's face and were focused on it, as well as the gun; their descriptions of the robber were accurate; and both of them were very confident of their identifications. Under the totality of the circumstances, the identifications were sufficiently reliable to go to the jury, and no error occurred.

*Involuntariness of the Admissions*

Prior to trial, the court held an Evidence Code section 402 hearing on the admissibility of defendant's statements to Sergeant Braconi. After considering Sergeant Braconi's testimony, an audiotape of the interview, and a transcript of the interview, the trial court concluded defendant's admissions were not induced by promises of leniency.

On appeal, defendant renews his argument that defendant's admissions were involuntary because Sergeant Braconi induced him "to admit knowledge of where the laptop was by implied promises of leniency, were he to assist the police in finding it." As we explain below, after a careful and independent review of Sergeant Braconi's testimony at the section 402 hearing, the audiotape of the statement, and the transcript of the interview, we also conclude that defendant's admissions were not induced by implied promises of leniency.

*Standard of Review*

"On appeal, we review independently the trial court's determination on the ultimate legal issue of voluntariness." (*People v. Williams* (1997) 16 Cal.4th 635, 659 (*Williams*).) "But any factual findings by the trial court as to the circumstances surrounding an admission or confession . . . are subject to review under the deferential substantial evidence standard." (*Id.* at p. 660. See also *People v. Vasila* (1995) 38 Cal.App.4th 865, 873 ["When, as here, the interview was tape-recorded, the facts surrounding the giving of the statement are undisputed, and the appellate court may independently review the trial court's determination of voluntariness."].)

*Applicable Legal Principles*

"The litmus test of a valid waiver or confession is voluntariness." (*People v. Kelly* (1990) 51 Cal.3d 931, 950 (*Kelly*).) "A confession or admission is involuntary, and thus subject to exclusion at trial, only if it is the product of coercive police activity." (*Williams, supra,* 16 Cal.4th at p. 659.) However, "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." (*Oregon v. Mathiason* (1977) 429 U.S. 492, 495.)

16

Nevertheless, that fact does not render admissions or confessions involuntary. Nor does the use of deceptions and ruses to convince the suspect that the police have evidence that ties him to the crime, although it is a factor suggestive of coercion. (*People v. Esqueda* (1993) 17 Cal.App.4th 1450, 1484 (*Esqueda*); *People v. Parrison* (1982) 137 Cal.App.3d 529 [gunpowder residue]; *People v. Watkins* (1970) 6 Cal.App.3d 119 [fingerprints].) "Although coercive police activity is a necessary predicate to establish an involuntary confession, it 'does not itself compel a finding that a resulting confession is involuntary.' [Citation.] The statement and the inducement must be causally linked." (*People v. Maury* (2003) 30 Cal.4th 342, 404–405 (*Maury*); *People v. Ray* (1996) 13 Cal.4th 313, 340; *People v. Benson* (1990) 52 Cal.3d 754, 778.) "A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence." (*Maury, supra*, at p. 404.)

In determining voluntariness, the critical issue is "whether the defendant's 'will was overborne at the time he confessed.' " (*Maury, supra,* 30 Cal.4th at p. 404; *In re Shawn D.* (1993) 20 Cal.App.4th 200, 208 (*Shawn D.*).) "No single event or word or phrase necessarily determines whether a statement was voluntary." (*Kelly, supra,* 51 Cal.3d at p. 950.) "In deciding the question of voluntariness, the United States Supreme Court has directed courts to consider 'the totality of circumstances.' " (*Williams, supra,* 16 Cal.4th at p. 660.) Relevant factors include details about the interrogation, such as its length and location, as well as the existence of any police coercion; they also include the individual characteristics of the accused, such as maturity, education, sophistication, and physical and mental condition. (*Ibid.;* see also *Shawn D., supra,* at p. 209.)

When an admission is challenged as involuntary, the People have the burden of proving voluntariness by a preponderance of the evidence. (*People v. Markham* (1989) 49 Cal.3d 63, 71.)

*Analysis*

Defendant argues Sergeant Braconi indicated to him "that if he assisted in getting the laptop returned, he would benefit substantially. The detective repeatedly linked the fact that witnesses were prepared to identify [defendant] with insinuation that he would

17

be treated more leniently were he to retrieve the laptop." As evidence of this implied or insinuated promise, defendant points to the following italicized portions of the questioning, prior to the cold show:

"[BRACONI]: 'So you're not gonna get identified tonight? Johnny?'

"[DEFENDANT]: 'Did they, did they said I did it? What can I do?'

"[BRACONI]: '*Well, there's something you can do. You can help me get your, their stuff back, which is the main thing they want. You know what I'm saying?*'

"[DEFENDANT]: 'Am I being accused or something?'

"[BRACONI]: 'Johnny?'

"[DEFENDANT]: '(Inaudible.)'

"[BRACONI]: 'Are they gonna identify you? It just happened less than 24 hours ago, man.'

"[DEFENDANT]: 'We'll find out.'

"[BRACONI]: 'Let me tell you something. They got you with the license plate on your car. That's why you got stopped.'

"[DEFENDANT]: 'Friends, my friends use[d] my car.'

"[BRACONI]: 'Well, but they saw you and they described you perfectly as the guy who put a gun in their face.'

"[DEFENDANT]: 'Gun?'

"[BRACONI]: 'Yeah.'

"[DEFENDANT]: 'I don't even have a gun.'

"[BRACONI]: 'You got a picture of a gun on your phone.'

"[DEFENDANT]: 'That's old.'

"[BRACONI]: 'Johnny? Johnny, before we go out there, can you tell me where their stuff is?'

"[DEFENDANT]: 'I don't know where their stuff is.'

"[BRACONI]: 'What happened to it?'

"[DEFENDANT]: 'I don't know.'

"[BRACONI]: 'Well, did your friend take it?'

18

"[DEFENDANT]:  'My friends use[d] my car all the time.'

"[BRACONI]:  'Dude, you were there.  They described you to a "t".'

"[DEFENDANT]:  'What do you mean they described me to a "t"?'

"[BRACONI]:  'They described you to a "t".'

"[DEFENDANT]:  'They described me?  How well?'

"[BRACONI]:  'Asian male, 20s, . . . slim to medium build.  Dark puffy coat, baggy jeans, [s]haved head.  Does [that] sound like anybody you know?'

"[DEFENDANT]:  '(Inaudible.)'

"[BRACONI]:  'With a license plate that matches your license plate?  Come on, man. Johnny?'

"[DEFENDANT]:  'A lot of Asians are bald.'

"[BRACONI]:  'Okay, but driving your car?  Johnny?'

"[DEFENDANT]:  'Did they say I—'

"[BRACONI]:  '—Johnny, Johnny.'

"[DEFENDANT]:  'What?'

"[BRACONI]:  '*Okay, once we go out there, there's no turning back.  I'm going to give you a chance right now, to help me get their property back and maybe alleviate this situation.*'

"[DEFENDANT]:  'What do you mean, alleviate the situation?'

"[BRACONI]:  'What do you mean alleviate—help me get their property back.  You want to tell me where their computer is?  Help me get the computer back.  How's that? Can you help me get the computer back?' "  (Italics added.)

Defendant argues that when Braconi told defendant there was something he could do, in response to defendant's questions "[D]id they said I did it?" and "[W]hat can I do?" it was the "conspiratorial equivalent to a wink, saying that though he was not explicitly offering lenient treatment, that was what he was consciously implying."  Then, when defendant still did not give up any information, Braconi said he was giving defendant one more chance to "alleviate this situation."  When defendant asked for clarification, Braconi "skirted the issue but continued to ask appellant for help in

19

retrieving the laptop." The bottom line is Braconi was responding to questions asserted by defendant.

We do not share defendant's interpretation of Braconi's interview tactics. Braconi was intent on recovering Amy's work laptop. His tactic was to convince defendant that the police already had so much evidence against him that he might as well help the victims out. We do not see Braconi's questions as conspiratorial. We do agree that Braconi's comment that he was going to give defendant "a chance right now" and that after the cold show there would be "no turning back" could have suggested to defendant that there was some sort of carrot being dangled in front of him if he cooperated. But, as defendant acknowledges, Braconi responded to defendant's request for clarification by "skirting the issue," while continuing to ask for help in locating the laptop. However, skirting the issue and asking for help is not the same as impliedly promising leniency. In our view, if Braconi's initial comments dangled a carrot before defendant, then Braconi's response effectively snatched the carrot back. Sergeant Braconi's response obliquely negated any implication that if defendant helped police recover the computer, there might be a "turning back." At most, Braconi's clarification suggested that defendant had misunderstood his comments, and that he meant only to appeal to defendant's altruism—that is, the situation to be alleviated was the *victims'*, not his. In any event, no admissions were made at this time. Braconi's comments did not yield the hoped for cooperation. Thus, Braconi's italicized comments prior to the cold show cannot be shown to be causally linked to any admission.

Braconi testified that after the cold show, on the way back to the holding area, defendant pointedly asked him, "What if I could get back their property?" Braconi responded, "it's something that the courts, the jury, the district attorney, and the judge . . . might consider as favorable to [you]." This did not amount to an implied promise of leniency either. It is akin to telling the defendant it would be better to tell the truth: as long as there is no promise of leniency as a reward for telling the truth, this tactic is not improper. (*People v. Belmontes* (1988) 45 Cal.3d 744, 773 (*Belmontes*), disapproved on

20

another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *Esqueda, supra,* 17 Cal.App.4th at p. 1484.)

Defendant also points to part of an exchange that occurred immediately after he questioned the officer. By this point, defendant had already indicated, in an unrecorded conversation, that he might be able to get the laptop back and had asked Braconi to bring him his phone so that he could make some phone calls. The following colloquy then occurred:

"[BRACONI]: 'This one yours? This yours? Turn around.'

"[DEFENDANT]: '(Mumbles.)'

"[BRACONI]: 'What's that?'

"[DEFENDANT]: '(Inaudible) laptop.'

"[BRACONI]: 'Well, I haven't seen a laptop yet, have I?'

"[DEFENDANT]: '(Inaudible.)'

"[BRACONI]: 'I don't know anything, man. All I know right now is is [*sic*] that you're saying that you may be able to get somebody's property back. *I don't, I'm not asking you how it's coming back.* You understand what I'm saying? I mean, there's there [*sic*] very well could've been more than one person involved in this, couldn't there have been? Right?'

"[DEFENDANT]: 'Mmm.'

"[BRACONI]: 'What happened to your hand?'

"[DEFENDANT]: 'I was born this way [unintelligible] downloaded stuff [unintelligible].'

"[BRACONI]: '(Inaudible.) Now this is a phone call to your mom, right, nobody else? What type of gun is that in that picture? Is it a real gun? What type is that, H & K? Holy moly, that thing moves slow. I thought my phone was slow.'

"[DEFENDANT]: 'Come on.'

"[BRACONI]: 'Have to reboot it?'

"[DEFENDANT]: 'Yeah. It takes a while for her to get here.'

21

"[BRACONI]: 'Would your mom know how to get to where we are? She knows the city?'

"[DEFENDANT]: 'Um, yeah she does.'

"[BRACONI]: 'Okay.'

"[DEFENDANT]: 'What is the street called?'

"[BRACONI]: 'This is, ah, Eddy? But I'll get you, let me get the exact address. What's the address here?'

"VOICE: '1125 Fillmore.'

"[BRACONI]: 'The cross is—'

"VOICE: 'Turk.'

"[BRACONI]: 'Eddy?'

"VOICE: 'Turk.'

"[BRACONI]: 'Okay, great. Thanks. All right, I got the address. Do you think you can get the phone too, or just the laptop?'

"[DEFENDANT]: '(Inaudible.)'

"[BRACONI]: 'What?'

"[DEFENDANT]: 'The laptop. (Inaudible.)'

"[BRACONI]: 'Okay.'

"[DEFENDANT]: 'I know of, I know of a laptop.'

"[BRACONI]: 'Okay, all right, I hear ya.'

"[DEFENDANT]: 'I don't know if it's the same one.'

"[BRACONI]: 'I'm glad I don't own a Blackberry, man. Are they all like this?'

"[DEFENDANT]: 'Am I still going to jail or you think you're gonna be [inaudible].'

"[BRACONI]: *We gotta, we gotta, so far, not, at this point you haven't even made a phone call yet. I mean, as far as you going to jail or not, like I told you, that's as far along in this investigation as we're at, all right? You got two people out there who've positively identified you. They want their property back, okay?*'

"[DEFENDANT]: 'What did they say?'

"[BRACONI]: 'What's that?'

22

"[DEFENDANT]: 'What did they say?'

"[BRACONI]: 'They said they want their property back. . . . [¶] Their main concern is getting their property back.'

"[DEFENDANT]: 'Are they willing to look—'

"[BRACONI]: 'What's that?'

"[DEFENDANT]: 'Are they willing to look the other way? Assuming that you—if I did.'

"[BRACONI]: 'Well, are you able to get the property is the question. I mean, that's what I wanna know.' " (Italics added.)

Defendant argues that Braconi was again speaking conspiratorially in telling defendant that he was not asking how defendant got the laptop back, and that even though Braconi "deflected" defendant's question whether he was "still going to jail," "the overall tenor of Braconi's statements were intended to lead [defendant] to believe that, were he to successfully orchestrate the return of the laptop, then [defendant] would be released or at least treated far more leniently." We disagree. In our view, the transcript shows that, after the cold show, defendant finally understood that Braconi had the upper hand in terms of evidence, and he was trying to make the best of a bad situation.

Defendant also argues that *Braconi* intimated to defendant that "he would look the other way, were the laptop returned," but again, we see it differently. Braconi never intimated that either he, or the victims, would look the other way. On the other hand, defendant's comment indicates that he was angling for a concession in exchange for his cooperation, a concession which Braconi never made.

"The line to be drawn between permissible police conduct and conduct deemed to induce or to tend to induce an involuntary statement does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth, as represented by the police. Thus, 'advice or exhortation by a police officer to an accused to "tell the truth" or that "it would be better to tell the truth" unaccompanied by either a threat or a promise, does not render a subsequent confession involuntary.' " (*People v. Hill* (1967) 66 Cal.2d 536, 549 (*Hill*);

23

*Belmontes, supra,* 45 Cal.3d at p. 773; *People v. Maestas* (1987) 194 Cal.App.3d 1499, 1507.) "When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct, we can perceive nothing improper in such police activity. On the other hand, if in addition to the foregoing benefit, or in the place thereof, the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible. The offer or promise of such benefit need not be expressed, but may be implied from equivocal language not otherwise made clear." (*Hill, supra,* at p. 549*; People v. Holloway* (2004) 33 Cal.4th 96, 115 (*Holloway*).)

The record shows that, at the beginning of the interview, defendant was confident he could not be tied to the robbery, and so he had no incentive to help the police find the laptop, and did not. However, as Braconi revealed the evidence against him and defendant became convinced that he had, in fact, been positively identified at the cold show, defendant hoped to ingratiate himself with Braconi and thereby wring some shred of leniency from Braconi by helping him get the laptop back. But the record shows that Braconi did not impliedly offer defendant a quid pro quo in exchange for defendant's assistance in recovering the laptop. We believe the evidence here indicates defendant was evaluating his options, shifting initially from confidence he would avoid being charged to concern over his circumstances after the cold show was completed.

It is true Braconi never explicitly disabused defendant of the misconception that some benefit might flow from his cooperation in the recovery of the laptop, as the police did in *People v. Boyde* (1988) 46 Cal.3d 212, 239, disapproved on another point in *People v. Williams, supra,* 16 Cal.4th 635, 660–661 [officer "clearly stated that he had no authority to make any promise of leniency . . . but could only pass information on to the district attorney"]. Neither did he ever indicate or imply that he would intercede with the legal authorities on defendant's behalf. (*Holloway, supra,* 33 Cal.4th at p. 116 ["detectives did not represent that they, the prosecutor or the court would grant defendant

24

any particular benefit if he told them how the killings happened"].) Viewed in the totality of the circumstances as we must, we conclude that Sergeant Braconi may have toed close to the line with his comment about alleviating the situation, but he did not cross into the land of improper police tactics.

Moreover, on this record, we cannot agree that Braconi's comments were the motivating cause of defendant's inculpatory statements. Defendant was no stranger to the workings of the criminal justice system of police, prosecutors and courts. He had several prior felony convictions and had served prior prison terms. It appears defendant's cooperation was motivated by the dawning realization that Braconi was not lying about the evidence against him, and his own desire to do something to mitigate the consequences he was facing, rather than by Braconi's interview tactics.

Finally, defendant argues that his admissions were involuntary because Sergeant Braconi "badgered" defendant about the laptop when he was about to faint. We disagree. Sergeant Braconi testified that defendant did not appear ill. In fact, defendant did not faint. In the recording of the interview, defendant does not sound as if he is being badgered, or as if he is about to faint. We conclude defendant's health was not an issue, and Sergeant Braconi did not take advantage of a sick man.

Defendant's admissions were voluntary under the totality of the circumstances and the trial court did not err in denying the defense motion to exclude them.

# DISPOSITION

The judgment is affirmed.

_____
Dondero, J.

We concur:

_____
Margulies, Acting P. J.

_____
Banke, J.