Filed 5/30/14  P. v. Cruz-Banuelos CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>JORGE JESUS CRUZ-BANUELOS, JR.,<br><br>　　　Defendant and Appellant. | A137806<br><br>(Sonoma County<br>Super. Ct. No. SCR609546) |

## INTRODUCTION

In 2011, brothers Johnnie and Thabiti Terry were stabbed during pre-Halloween celebrations in downtown Santa Rosa, the apparent victims of gang violence.  Both men identified defendant, a known gang member, as their assailant. A brand new knife, bought the day after the stabbing, was found in defendant's car.  A jury convicted him of the assaults.  Defendant, represented by new counsel, brought an unsuccessful motion for a new trial, alleging trial counsel was ineffective for failing to move for suppression of the victims' pretrial identifications, and for failing to present an expert on eyewitness identification.  The court sentenced defendant to state prison for 17 years four months. Defendant timely appeals, contending his trial attorney rendered ineffective assistance of counsel. We find counsel was not ineffective and affirm the judgment.

## STATEMENT OF THE CASE

Defendant was charged in a three-count information with being an active participant in a criminal street gang and assaulting Johnnie and Thabiti Terry with a

knife. (Pen. Code, §§ 186.22, subd. (a), 245, subd. (a)(1).)[1] Defendant was alleged to have personally inflicted great bodily injury on both men and to have committed the assaults for the benefit of a criminal street gang. (§§ 12022.7, subd. (a), 186.22, subd. (b)(1).) The information also alleged defendant had sustained a prior strike and serious felony conviction. (§§ 1170.12, 667, subd. (a)(1).)

The trial court dismissed the great bodily injury allegation as to Thabiti. The jury returned guilty verdicts on all counts and true findings on the remaining allegations. The court found the prior strike and serious felony conviction allegations true.

Following denial of defendant's motion for a new trial , the court struck the jury's gang finding and sentenced defendant to a total term of 17 years four months in prison.

STATEMENT OF FACTS

On October 29, 2011, brothers Johnnie and Thabiti Terry and their friend Gilbert were out celebrating Halloween in downtown Santa Rosa. They spent 20 to 30 minutes at Stout Brother's bar on Fourth Street before walking past a club called Chrome Lotus where Johnnie saw two individuals he knew, Shishay and Hector. Johnnie considered Shishay a buddy, but there was bad blood between Johnnie and Hector dating back one or two years to an incident in which the police were called.[2]

Johnnie and Hector argued, and Hector took off his belt and swung it at Johnnie, Thabiti, and Gilbert. According to Johnnie, Hector was saying, "I'm going to get you" or "South Park." That incident ended when Johnnie, Thabiti, and Gilbert left the scene. After walking a ways, they decided to go home.

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.
[2] The officer testified the incident occurred on August 15, 2009. Johnnie was intoxicated and had a mark under his eye consistent with being punched when he told the officer, "I will lie my ass off and say you beat my ass and punched me." Johnnie appeared to know what he was saying. At trial, Johnnie admitted only, "That's what the police report said, yeah."

2

## I. The Altercation

On the way back to their car, they were confronted by six or seven people, most of whom Johnnie knew, including Hector and defendant. Johnnie had known defendant for six years before trial. Johnnie's ex-girlfriend's cousin had dated defendant's aunt. Johnnie had dated his ex-girlfriend for four years and, during that time, Johnnie had socialized with defendant at many family functions and had played poker with him. Johnnie considered defendant a friend. A month before the confrontation, Johnnie had seen defendant at a bar in downtown Santa Rosa and the two had exchanged high fives.

The confrontation occurred 10 to 15 minutes after the initial altercation with Hector. One of the people Johnnie did not know started getting really loud, yelling, "Where he's [*sic*] from? South Park" and "We're going to get you." Defendant and at least one other person yelled "South Park." Defendant was wearing a black sweater, black beanie cap, and jeans. Defendant and Johnnie acknowledged each other, and at first it seemed there was not going to be a problem between them.

Then, the person Johnnie did not know punched Johnnie. Johnnie hit him back, knocked him to the ground, and turned to see what was going on with his brother, who was behind him. When he saw Thabiti was struggling with defendant, he swung at defendant and saw Thabiti bend over. "[T]hat's when my brother got stabbed, and the closest one to him was J.J., so I went towards J.J."

Defendant ran toward Johnnie flashing his knife and yelling, "South Park." Others in defendant's group also shouted, "South Park" and "We're going to get you" or "We got you." At first, Johnnie backtracked holding his arm up, but when defendant cut Johnnie's forearm and bicep, Johnnie turned around and ran. He was running away when defendant stabbed Johnnie in the side, puncturing his lung.

At trial, Thabiti identified defendant as one of the people who confronted him, Johnnie, and Gilbert on their way back to the car, and as the person who stabbed him. To Thabiti, it seemed that defendant was the "enforcer guy amongst his gang of guys." He

3

stood in front of them, posturing, his feet shoulder-width apart and his arms at his sides, with clenched fists. It appeared to Thabiti his brother knew people in the group, but Thabiti did not recognize anyone other than the individual who had been swinging the belt earlier. He did not know defendant before the confrontation.

According to Thabiti, defendant jumped towards Johnnie with a knife in each of his hands. When Thabiti pushed Johnnie out of the way, defendant stabbed Thabiti in the torso and upper left thigh. As Thabiti ran away, he saw defendant lunge at his brother with the knives, and heard defendant yelling, "South Park" and "Sureño."

Thabiti, Gilbert, and Johnnie regrouped in an alleyway where Johnnie took off his shirt and tied it around the stab wound on his side. Despite Johnnie's difficulty breathing, he debated whether to go to the hospital because he was uninsured and did not want to pay for treatment. In the end, Thabiti convinced him to go and Gilbert drove Johnnie to the hospital.

After receiving some treatment, Johnnie checked himself out of the hospital against medical advice because he was concerned about the cost of a hospital stay.

Johnnie did not call the police after the altercation or from the hospital. Thabiti did not call the police or seek medical treatment for his wounds that night either. Like Johnnie, he did not have insurance. However, two days later he went to a clinic and received four stitches for the stab wound in his leg.

## II. Johnnie's Pretrial Identification of Defendant

Johnnie did not call the police because he did not think "it was a big deal" and he "figure[d] I'll see [J.J.] another day." Nevertheless, Santa Rosa Police Officer Christopher Diaz interviewed Johnnie at the hospital about the stabbing. According to Johnnie, the police officer showed him a photo lineup, but he did not pick anyone out. Johnnie told Officer Diaz he did not know who stabbed him and did not want to press charges. The officer mentioned that if he cooperated, the police might be able to help him, but that did not make him want to cooperate with the police that night.

4

Sometime later, Johnnie received a hospital bill in the mail for $47,000. At that point, he decided to cooperate with the police because the authorities offered to help him pay the bill. He told the police he was stabbed by "[a] dude I know by the name of J.J." meaning defendant, J.J. Cruz. Johnnie pressed charges solely to obtain assistance paying off the hospital bill. If the authorities had not offered him financial assistance he would never have involved them. He would have killed defendant, because defendant tried to kill him.

Officer Diaz remembered events differently. Although Johnnie was reluctant to give him much information at the hospital, he told Diaz "J.J. Cruz" stabbed him. Officer Diaz denied telling Johnnie he would receive help with his medical bills, or any other benefit, if he cooperated with the police.

After speaking with Johnnie, Diaz informed Detective Sinigiani that Johnnie had identified "J.J. Cruz" as his assailant. Sinigiani recognized the name as defendant's and asked Diaz to put together a photo lineup to show to Johnnie. In Santa Rosa, the jail generates a booking photograph of the suspect, and then "the computer generates the other pictures based off of similarities." Diaz showed the six-pack lineup he generated to Johnnie at the hospital around 5:00 a.m. Before showing Johnnie the photo array, Diaz told Johnnie, "you had told me that you thought it was so and so. I have information to believe I know who that person is. I do have a group of photographs that I'd like for you to look at." Officer Diaz then read Johnnie a form admonishment, the gist of which is, "I have six photos that I'd like for you to look at. The photos may or may not contain the person you believe committed this crime. You are under no obligation to identify one. I'd like for you to keep an open mind while you review these photographs. I will not say anything. I'll let you tell me what you think." Johnnie looked at the photos, "sort of smiled and said, 'this is him.' " Johnnie initialed defendant's photograph.

At trial, Johnnie was shown a photographic lineup and identified it as one he had seen earlier in the district attorney's office. He identified defendant's picture in the

5

lineup. He identified defendant in the courtroom as the person he knew as Jorge or J.J. Cruz.

## III.  Thabiti's Pretrial Identification of Defendant

Thabiti's first instinct, like Johnnie's, was to "kill the guy myself." However, a couple of days after the stabbing, Thabiti went to meet with Detective Sinigiani at the Santa Rosa Police Department. He told Sinigiani what had happened, including that the individual who swung the belt also had a knife.

Sinigiani showed Thabiti an array of photographs and asked if he could identify anyone. Thabiti was not able to pick anyone out of the photographic lineup. Eventually, Thabiti learned that criminal charges had been filed against somebody in this case, and Thabiti went to one of the court proceedings. There, he saw defendant (the person who was charged) and called the detective, because he saw the individual who had stabbed him and "remember[ed] exactly the individual's face after I saw him." It was "like a flashback. And I was immediately able to recognize the face that I recall sticking me with the knife." Thabiti testified he was "110 percent confident that [defendant] is the one that stabbed me, and the one that tried to kill my brother and myself."

## IV.  Defendant's Arrest

Defendant was arrested on November 2, 2011. Police found a folding black and silver knife in his pants pocket. In defendant's car, police found a Walmart bag with the empty packaging for a Kershaw brand folding knife and a receipt for the knife dated October 30, 2011. The knife in defendant's pocket had the same model number as the packaging, and the knife fit into the packaging perfectly. The police also found a black baseball cap in the trunk and a black hooded sweatshirt on the front passenger seat.

## V.  Gang Evidence

Detective Sinigiani testified as an expert on criminal street gangs and the identification of criminal street gang members. He recognized the moniker "J.J." as belonging to defendant from years of investigating gang crimes in Santa Rosa. On the

day defendant was arrested, defendant sported the word "Parkero" tattooed on his abdomen and the Huelga bird, a symbol on the United Farmworkers' flag, tattooed on his chest along with the phrase "last of a dying breed."

The gang Vario South Park, or "VSP," is affiliated with the Norteño criminal street gang and claims the South Park area of Santa Rosa. The word "Parkero" refers to a person from South Park. Norteños use the symbol of the Huelga bird. In Detective Sinigiani's opinion, a person would not sport the "Parkero" tattoo unless he were a member of the Vario South Park gang. The common phrase "last of a dying breed" is not necessarily gang-related, but Sinigiani opined that in conjunction with the Huelga bird tattoo, it reflected defendant's dedication to the Norteño gang's agenda of committing crimes.

Gang members are usually armed; they use weapons to protect themselves from rivals and to commit assaults on rivals. Gangs gain respect when they commit crimes, and gang members who commit violent assaults are viewed as leaders within the gang. Norteños will assault people who are not associated with rival gangs. Yelling out the name of a gang territory or the name of the gang, may be a gang challenge, or it may be a way of calling fellow gang members to assist the member who shouted the challenge.

Detective Sinigiani testified about numerous instances of defendant's participation or association with Norteño gangs, and opined defendant was an active Norteño gang participant on October 30, 2011.

## DISCUSSION

### I. The Record Does Not Demonstrate That Trial Counsel's Failure To File A Motion to Suppress the Terry Brothers' Pretrial and Trial Identifications, or to Present An Expert on the Unreliability Of Eyewitness Identifications, Was the Result of Ineffective Assistance of Counsel.

Defendant argues that his trial attorney's failure to seek exclusion of the Terry brothers' trial and pretrial identifications of him as their knife-wielding assailant constituted ineffective assistance of counsel. We disagree because, as we explain below,

7

such motions would have been properly denied. Counsel's decision to forego making motions that stood little or no chance of success was well within the range of reasonable representation expected of a competent criminal defense attorney.

## A. Principles Governing Ineffective Assistance Of Counsel Claims

Under state law, "[t]o prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. [Citations.] Counsel's performance was deficient if the representation fell below an objective standard of reasonableness under prevailing professional norms. [Citation.] Prejudice exists where there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." (*People v. Benavides* (2005) 35 Cal.4th 69, 92-93, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 693-694 (*Strickland*).) A reasonable probability is a probability sufficient to undermine confidence in the outcome. (*People v. Hart* (1999) 20 Cal.4th 546, 624 (*Hart*).) The rule is the same under federal law. "To establish ineffective assistance of counsel 'a defendant must show both deficient performance by counsel and prejudice.' " (*Premo v. Moore* (2011) ___ U.S.___ [131 S.Ct. 733, 739] citing *Knowles v. Mirzayance* (2009) 556 U.S. 111, 122 (*Knowles*).)

In this context, "[j]udicial scrutiny of counsel's performance must be highly deferential. . . . Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." (*Strickland, supra,* 466 U.S. 668, 689.) For that reason, " '[t]actical errors are generally not deemed reversible; and counsel's decisionmaking must be evaluated in the context of the available facts. [Citation.] To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation . . . ." [Citation.]' " (*Hart, supra,* 20 Cal.4th 546, 623-624.) Specifically, to

demonstrate that counsel's failure to make a suppression motion was the product of incompetence, the defendant must show the motion would have been meritorious and there is a reasonable probability that the verdict would have been different absent the excluded evidence. (*People v. Wharton* (1991) 53 Cal.3d 522, 576.) "[N]o Supreme Court precedent establish[es] a 'nothing to lose' standard for ineffective-assistance-of-counsel claims." (*Knowles, supra*, 556 U.S. 111, 122.)

## B. Principles Governing Pretrial Identification Procedures

We apply the following principles governing the admissibility of eyewitness identifications to the question whether a motion to suppress Johnnie's pretrial identification of defendant's picture from a six-photo array, and Thabiti's identification of defendant at a pretrial court hearing, would have been meritorious. The defendant bears the burden below of showing an unreliable identification procedure. (*People v. Ochoa* (1998) 19 Cal.4th 353, 412 (*Ochoa* ).) " 'The issue of constitutional reliability depends on (1) whether the identification procedure was unduly suggestive and unnecessary [citation]; and if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances . . . . If, and only if, the answer to the first question is yes and the answer to the second is no, is the identification constitutionally unreliable.' [Citation.] In other words, '[i]f we find that a challenged procedure is not impermissibly suggestive, our inquiry into the due process claim ends.' [Citation.]" (*Id.* at p. 412; see also *People v. Kennedy* (2005) 36 Cal.4th 595, 608 (*Kennedy*), overruled on another point in *People v. Williams* (2010) 49 Cal.4th 405, 459.)

## C. Standards Of Review

A claim of ineffective assistance of counsel presents a mixed question of law and fact, which we review de novo. (*In re Alcox* (2006) 137 Cal.App.4th 657, 664-665.) We independently review a trial court's ruling that a pretrial identification procedure was not unduly suggestive. (*People v. Avila* (2009) 46 Cal.4th 680, 698-699.) In determining

9

whether a given identification procedure was unduly suggestive, we look to the totality of the circumstances. (*People v. Wimberly* (1992) 5 Cal.App.4th 773, 788.)

### D.  Johnnie's Pretrial Identification of Defendant Was Not Made Under Unduly Suggestive Or Unnecessary Circumstances

Analyzing defendant's claims with these principles in mind, we find no deficient performance or prejudice from counsel's asserted failure to challenge the admissibility of the victims' pretrial identifications.  Defendant argues that "[r]easonably competent counsel would have sought to exclude identification testimony by the victim-witnesses here because they were the result of unduly suggestive circumstances."

With respect to Johnnie, the most suggestive circumstance identified is his financial motive.  "This motive more than suggests deliberate misidentification for self-serving purposes."  It may.  However, Johnnie's motive to lie – which, as defendant admits, was the subject of examination at trial – does not reflect on the suggestiveness of the photographic lineup procedure employed here by Officer Diaz.  He would have had the same motive to lie whether or not the procedures used to secure an identification were fair or unfair.  Johnnie's motive to lie was not a basis for suppression of his pretrial identification of defendant from a six-photo lineup.

Defendant does not challenge the procedure used to assemble the photo lineup or the fairness of the lineup itself.  He does argue the photo lineup should have included photos of Shishay and Hector.  However, there is no showing Shishay or Hector looked anything like defendant, or that the inclusion of their photographs would have somehow enhanced the fairness of the photographic lineup shown to Johnnie.  Defendant does not argue the circumstances here required the police to show Johnnie multiple photographic lineups, one each for Shishay and Hector alone.

Defendant also challenges the admonition given by Officer Diaz to Johnnie prior to showing Johnnie the photographic lineup as unduly suggestive because Johnnie was told prior to viewing the photo lineup that it included "J.J. Cruz."  But the record reflects

10

Officer Diaz testified he told Johnnie, "*you* had told me that you thought it was so and so. I have information to believe I know who that person is. I do have a group of photographs that I'd like for you to look at." (Italics added.)[3] He then went on to read Johnnie a standard admonishment: "I have six photos that I'd like for you to look at. The photos may or may not contain the person you believe committed this crime. You are under no obligation to identify one. I'd like for you to keep an open mind while you review these photographs. I will not say anything. I'll let you tell me what you think."

" 'A procedure is unfair which suggests in advance of identification by the witness the identity of the person suspected by the police.' [Citation.]" (*Ochoa, supra,* 19 Cal.4th 353, 413.) Whether an identification procedure is suggestive depends upon the procedure used, as well as the circumstances in which the identification takes place. So far as appears on this record, Officer Diaz used computer-generated pictures to assemble a photographic lineup of reasonably similar-looking men, one of which depicted defendant, whom Johnnie had already identified as his assailant by name. The procedure used here did not suggest in advance that Johnnie should choose defendant's picture, or even that a picture of the person *Johnnie* knew as "J.J." would be in the lineup. Given the totality of these facts and circumstances, a motion to suppress Johnnie's pretrial and trial identifications based on the constitutional principles discussed above would have been a futile act. Counsel was not ineffective for failing to make such a motion.

### E. Thabiti's Pretrial Identification of Defendant, Even if Made Under Unduly Suggestive or Unnecessary Circumstances, Was Not Subject to A Suppression Motion.

Defendant argues Thabiti's pretrial identification of defendant at a court proceeding was unduly suggestive because the photograph shown to Thabiti was taken

---

[3] At the hearing on the motion for a new trial, Officer Diaz was asked: "At some point during the admonition, about halfway through it, you interject 'you did give me a name of J[.]J[.] Cruz.' Is that right?" Officer Cruz responded, "That's correct. . . . [¶] I don't recall doing it, but I read the transcript and apparently it says I did it so…."

just two days prior to the court hearing, and because seeing someone in court and in custody is "akin to a single person show-up . . . in a highly suggestive environment." We disagree.

"Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." (*Neil v. Biggers* (1972) 409 U.S. 188, 198.) However, we begin our analysis with the understanding that a single-person show-up *is* inherently suggestive (*People v. Odom* (1980) 108 Cal.App.3d 100, 110), but is not for that reason inherently unfair. Prompt identification of a suspect close to the time and place of the offense serves a legitimate purpose in quickly ruling out innocent suspects and apprehending the guilty. (*People v. Martinez* (1989) 207 Cal.App.3d 1204, 1219.) Such an identification is likely to be more accurate than a more belated identification. (*Ibid.*)

However, the "due process check on the admission of eyewitness identification," by way of pretrial suppression motion does not extend "to cases in which the suggestive circumstances were not arranged by law enforcement officers." (*Perry v. New Hampshire* (2012) 565 U.S. __ [132 S.Ct. 716, 720-721]; see also *People v. Thomas* (2012) 54 Cal.4th 908, 931.) In *Perry, supra*, the United States Supreme Court considered and rejected an argument for permitting a defendant to move for exclusion of an unduly suggestive pretrial identification, regardless of law enforcement involvement, "because of the grave risk that mistaken identification will yield a miscarriage of justice. [Fn. omitted.] Our decisions, however, turn on the presence of state action and aim to deter police from rigging identification procedures, for example, at a lineup, showup, or photograph array. When no improper law enforcement activity is involved, we hold, it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of

12

eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt." (*Perry v. New Hampshire, supra*, 565 U.S. [132 S.Ct. at p. 721].) In this case, Thabiti's attendance at the pretrial proceeding, and his subsequent identification of defendant, was not law-enforcement driven. He attended the court hearing on his own. Under *Perry, supra*, a motion to suppress Thabiti's pretrial identification would not have been properly entertained by the trial court. Perforce, counsel could not have been ineffective for failing to bring a motion that could not be heard.[4]

### F. Denial of A Motion to Present Expert Testimony on the Unreliability of Eyewitness Testimony, Had One Been Made, Would Not Have Been An Abuse of Discretion.

Finally, defendant argues his trial attorney was ineffective for failing to present an eyewitness identification expert who could have informed the jury "just how unreliable an eyewitness identifications can be." Trial counsel was not asked about her reasons for not engaging an expert on this topic and, given the deference we must accord trial counsel's tactical decisions, we will not speculate there were no conceivable reasons for it. Moreover, while trial counsel was free to hire such an expert, she was not at liberty to simply call one as an expert witness. "[T]he decision to admit or exclude expert testimony on psychological factors affecting eyewitness identification remains primarily a matter within the trial court's discretion." (*People v. McDonald* (1984) 37 Cal.3d 351, 377, overruled on another ground in *People v. Mendoza* (2000) 23 Cal.4th 896, 914.) The controlling consideration in determining the admissibility of expert testimony on this subject is whether the subject matter is "sufficiently beyond common experience" such that the testimony of an expert would be of some assistance to the jury. (Evid. Code, § 801, subd. (a); *McDonald, supra,* 37 Cal.3d at p. 373; *People v. Valdez* (1997) 58 Cal.App.4th 494, 506.)

---

[4] In fact, at the hearing on the new trial motion, trial counsel testified she did not file a motion to challenge Thabiti's pretrial identification of defendant because Thabiti Terry had "on his own and without police involvement" identified defendant.

"Expert testimony on the psychological factors affecting eyewitness identification is often unnecessary. For this reason, the trial court's discretion regulating its use is rarely disturbed." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 995, citing *McDonald,supra,* 37 Cal.3d at p. 377 [no ineffective assistance of counsel found for failure to offer eyewitness expert testimony].) Case law bears out this observation. (*People v. Jones* (2003) 30 Cal.4th 1084, 1112 [no abuse of discretion]; *People v. Sanders* (1995) 11 Cal.4th 475, 509-510 [no abuse of discretion]; *People v. Walker* (1988) 47 Cal.3d 605, 628 [it would not have been abuse of discretion to admit testimony, but no abuse of discretion found for excluding it]; *People v. Goodwillie* (2007) 147 Cal.App.4th 695, 725 [no denial of right to present meaningful defense]; *People v. Sandoval* (1994) 30 Cal.App.4th 1288, 1297 [no abuse of discretion].) *MacDonald* suggests that "[e]ven when the trial court correctly excludes such testimony, the defendant may be entitled to a special instruction specifically directing the jury's attention to other evidence in the record ― e.g., facts developed on cross-examination of the eyewitnesses ― that supports his defense of mistaken identification and could give rise to a reasonable doubt of his guilt." (*People v. McDonald, supra*, 37 Cal.3d 351, 377, fn. 24.) That was done here.[5]

---

[5] The trial court gave the following instruction: "You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. [¶] In evaluating identification testimony, consider the following questions:

• *Did the witness know or have contact with the defendant before the event?*
• How well could the witness see the perpetrator?
• What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance, and duration of observation?
• How closely was the witness paying attention?
• *Was the witness under stress when he or she made the observation?*
• Did the witness give a description and how does that description compare to the defendant?
• How much time passed between the event and the time when the witness identified the defendant?
• Was the witness asked to pick the perpetrator out of a group?

Defendant argues an expert should have been called to explain to the jury that, in addition to stress and fear, "weapon focus" by a witness "can lead to reduced ability to remember and accurately describe other details," and "unconscious transference" can cause a witness to recognize " 'someone that they have seen before as a person who participated in a later event' even though he/she is not actually the participant in the later event." However, defendant fails to show that either of these phenomena actually played an important part in *these* witnesses' identifications, or that the jury could not evaluate the effect of stress and fear without the aid of expert testimony. Nothing in *McDonald, supra,* 37 Cal.3d 351, suggests the possible existence of hypothetical factors affecting eyewitness identification requires a court to admit expert testimony on eyewitness identification. On such a showing as is made in these appellate briefs, the trial court would have been well within its discretion to exclude such testimony, had a motion been made for its presentation. Under these circumstances, ineffective assistance of counsel has not been demonstrated.

## CONCLUSION

Trial counsel did not render ineffective assistance of counsel by failing to move to suppress the victims' identifications of defendant, or failing to present an expert witness on the psychological factors affecting eyewitness identification.

---

• Did the witness ever fail to identify the defendant?
• Did the witness ever change his or her mind about the identification?
• How certain was the witness when he or she made an identification?
• Are the witness and the defendant of different races?
• Was the witness able to identify the defendant in a photographic or physical lineup?
• Was the witness able to identify other participants in the crime?
• Were there any other circumstances affecting the witness's ability to make an accurate identification?
The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find that the defendant [is] not guilty." (CALCRIM No. 315; italics added.)

**DISPOSITION**

The judgment is affirmed.

_____
Dondero, J.

We concur:

_____
Margulies, Acting P.J.

_____
Banke, J.